**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES FIELDS; TAMMANY FIELDS;
STUART HABERMAN; ROBERT
HOAGLIN; KATHIE HOAGLIN;
VANESSA SHETLER,
             *Plaintiffs-Appellants,*

             v.

PALMDALE SCHOOL DISTRICT (PSD);
MICHAEL GEISSER; ARLAND
ATWOOD,
             *Defendants-Appellees.*

No. 03-56499

D.C. No.
CV-03-00457-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
June 2, 2005—Pasadena, California

Filed November 2, 2005

Before: Donald P. Lay,* Stephen Reinhardt, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Reinhardt

*The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

15059

**COUNSEL**

Erik Gunderson, Esq., Steven C. Shonack, Esq., Gunderson, Schlichter, Shonack & Handel, LLP, Manhattan Beach, Cali-

fornia; Duane L. Bartsch, Esq., Law Offices of Duane Bartsch, Manhattan Beach, California, for the plaintiffs-appellants.

Dennis J. Walsh, Esq., Douglas Lyon, Esq., Law Offices of Dennis J. Walsh, APC, Encino, California, for the defendants-appellees.

## OPINION

REINHARDT, Circuit Judge:

When parents of schoolchildren in Palmdale, California learned from their sons and daughters that they had been questioned in their public elementary school about sexual topics such as the frequency of "thinking about having sex" and "thinking about touching other peoples' private parts," some of them exercised their constitutional right to take their grievance to the courts. The questioning was part of a survey the Palmdale School District was conducting regarding psychological barriers to learning. The parents brought an action in district court against the School District and two of its officials for violating their right to privacy and their right "to control the upbringing of their children by introducing them to matters of and relating to sex." They brought both federal and state claims. The district court dismissed the federal causes of action for failure to state a claim upon which relief could be granted and dismissed the state claims without prejudice to their right to re-file in state court. We agree, and hold that there is no fundamental right of parents to be the *exclusive* provider of information regarding sexual matters to their children, either independent of their right to direct the upbringing and education of their children or encompassed by it. We also hold that parents have no due process or privacy right to override the determinations of public schools as to the information to which their children will be exposed while enrolled as stu-

dents. Finally, we hold that the defendants' actions were rationally related to a legitimate state purpose.

## I.

Kristi Seymour volunteered as a "mental health counselor" at Mesquite Elementary School while she was enrolled in a master's degree program at the California School of Professional Psychology. The Palmdale School District, of which Mesquite was a part, collaborated with the School of Professional Psychology, the Children's Bureau of Southern California, and Seymour to develop and administer a psychological assessment questionnaire for first, third, and fifth grade students with the announced goal of "establish[ing] a community baseline measure of children's exposure to early trauma (for example, violence)."

Prior to administering the survey, Seymour mailed a letter to the parents of the children to be surveyed informing them of the questionnaire's nature and purpose, and requesting their consent to its administration.[1] The parental consent letter was

---

[1]The letter states:

**"Parental Consent**

Dear Parent or Caregiver:

The Palmdale School District is asking your support in participating in a district-wide study of our first, third and fifth grade children. The study will be a part of a collaborative effort with The California School of Professional Psychology — CSPP/ Alliant International University, Children's Bureau of Southern California and the Palmdale School District.

The goal of this assessment is to establish a community baseline measure of children's exposure to early trauma (for example, violence). We will identify internal behaviors such as anxiety and depression and external behaviors such as aggression and verbal abuse. As a result, we will be designing a district wide intervention program to help children reduce these barriers to learning, which students can participate in. Please read this consent letter and if you agree, please sign and send it back to your school's principal no later than December 20, 2001.

enclosed in a School District envelope and was mailed using School District postage. The letter did not explicitly state that some questions involved sexual topics, although it did specify that the survey questions were about "early trauma (for example, violence)" and there was a warning that "answering questions may make [the] child feel uncomfortable."

After the School District approved the survey, Seymour administered it during school hours at Mesquite Elementary School. She sat with the students, aged seven to ten, while they completed the survey and ensured that they read and responded to each question. The survey included seventy-nine

---

The assessment will consist of three, twenty-minute self-report measures, which will be given to your child on one day during the last week of January. This study is 100% confidential and at no time will the information gathered be used to identify your child. Your child will not be photographed or videotaped. You may refuse to have your child participate or withdraw from this study at any time without any penalty or loss of services to which your child is entitled.

[—page break—]

I am aware that the research study coordinator, Kristi Seymour, one research assistant, the Palmdale School District, Director of Psychology, Michael Geisser, and a professor from CSPP, will be the only people who have access to the study's information. After the study is completed, all information will be locked in storage and then destroyed after a period of five years.

I understand answering questions may make my child feel uncomfortable. If this occurs, then, Kristi Seymour, the research study coordinator, will assist us in locating a therapist for further psychological help if necessary. If I have further questions, I may contact Kristi Seymour at 1529 E. Palmdale Blvd., Suite 210, Palmdale, CA 93550 at 661.272.9997 x128. I understand that I will not be able to get my child's individual results due to anonymity of the children, but I may get a summary report of the study results.

I have read this form and understand what it says. I her[e]by agree to allow my child to participate in this district-wide study." (emphasis in original). Additionally, two lines were made available on the "Parental Consent" form for the "Parent/Caregiver" to sign and date it.

questions testing the frequency that the subjects experienced a variety of sensations, emotions, thoughts, and experiences. It was composed of four questionnaires. The first questionnaire contains fifty-four questions and is copyrighted by Psychological Assessment Resources, Inc.[2] The children were asked to rate the following activities, among others, on a scale from "never" to "almost all the time": "Bad dreams or nightmares," "Feeling dizzy," "Wanting to yell at people," "Wanting to hurt other people," "Trying not to have feelings," "Can't stop thinking about something bad that happened to me," and "Wanting to kill myself." Ten of those questions were about sexual subjects.[3] The second part of the survey is labeled "Bialer-Cromwell LC Scale (Modified)."[4] These questions concentrate on the child subject's perception of other people and the external world. The third part follows the same format as Bialer-Cromwell, but the questions focus upon the

---

[2]Psychological Assessment Resources, Inc. is a leading publisher of assessment instruments, software, books, and other related materials. *See* http://www.parinc.com (last visited Aug. 16, 2005).

[3]The sexual references are:

    8.  Touching my private parts too much

  17.  Thinking about having sex

  22.  Thinking about touching other people's private parts

  23.  Thinking about sex when I don't want to

  26.  Washing myself because I feel dirty on the inside

  34.  Not trusting people because they might want sex

  40.  Getting scared or upset when I think about sex

  44.  Having sex feelings in my body

  47.  Can't stop thinking about sex

  54.  Getting upset when people talk about sex

[4]The Bialer-Cromwell Locus of Control Scale is a 23-item, "yes-no" questionnaire that measures the extent to which a child construes outcomes as being consequential to his own actions (i.e., internally controlled) rather than due to the whims and/or manipulations of fate, chance, or other people (i.e., externally controlled).

children's past traumatic experiences. Among the questions are the following: Have you ever "[B]een threatened or chased by a gang?", "Seen someone get shot?", "Been in a car accident?", "Been touched by someone, on your body, that made your feel uncomfortable?", and "Know[n] anyone who has or is being abused?" The final part is limited to demographic information such as the student's grade, race, and familial living arrangement.

Plaintiffs James and Tammany Fields, Stuart and Kathleen Haberman, Robert and Kathie Hoaglin, and Vanessa Shetler are parents of minor children who were enrolled at Mesquite Elementary School. All of them had children who participated in the survey. The parent-plaintiffs learned of the sexual nature of some of the questions on the survey when their children informed them of the questions after they had completed the questionnaires. The parents allege that if they had known the true nature of the survey, they would not have consented to their children's involvement. Prior to filing in federal court, the parents initially sought redress for their alleged injuries through an administrative tort claim filed with the Palmdale School Board. Therein, they alleged that their "basic constitutional right to control" their children's upbringing had been "robbed" by the defendants' actions. Their claim was denied and they subsequently filed a complaint in district court alleging four causes of action: (1) violation of their federal constitutional right to privacy; (2) violation of their California constitutional right to privacy; (3) deprivation of civil rights pursuant to 42 U.S.C. § 1983; and (4) negligence. The parents sought damages and injunctive relief.

Defendant Michael Geisser is the Palmdale School District's Director of Psychological Services, and Arland Atwood is the principal of Mesquite Elementary School; both Atwood and Geisser are sued in their official capacities.[5] The defen-

---

[5]Although Seymour was named as a defendant in the complaint, she is not a party to the case. In the notice of appeal, the parent-appellants admit that she "was not served, has not appeared, and is not a party to this appeal."

dants did not file an answer to the complaint. Instead, they moved under Fed. R. Civ. Pro. 12(b)(6) to dismiss the entire action for failure to state a claim upon which relief could be granted. They asserted that there is no deeply rooted and fundamental right of parents "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs." They further contended that the § 1983 claim was not viable because the parents' civil rights had not been violated and that even if they had, the School District is immune from suit and the individual defendants are entitled to qualified immunity. Finally, they argued that they are not liable under California law because their actions were discretionary and state law immunity applies.

The parents countered that the administration of the survey violated their constitutional privacy right as well as their right to control their children's exposure to sexual subjects, that the defendants arrogated unto themselves the parents' right to determine how their children learn about sexual matters, and that the defendants are not immune from suit.

After holding a hearing on the motion, the district court dismissed the federal claims for "lack of a cognizable legal theory." In doing so, it first recharacterized the parents' privacy claim as a substantive due process claim because "all of the Parents' arguments concerning the claim are grounded in the Fourteenth Amendment's Substantive Due Process Clause. Other than citing generally to privacy cases outside the Fourteenth Amendment's scope, the Parents do not connect their asserted interest . . . to the First, Third, Fourth, Fifth, Ninth, or Tenth Amendments." The court ruled next that the right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" does not rise to the level of a fundamental right protected by Substantive Due Process. It further concluded that the fundamental right to direct the upbringing and education of one's children does not

encompass the right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs." Finally, the court declined to exercise supplemental jurisdiction over the state law causes of action and dismissed them without prejudice. The parents now appeal.

## II.

On appeal, the parents challenge the district court's dismissal of their federal claims for failure to state a claim upon which relief may be granted.[6] The district court's dismissal pursuant to Rule 12(b)(6) for failure to state a claim is reviewed *de novo*. *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001).

The parents argue that the defendants' actions deprived them of their free-standing fundamental right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs." They also contend that the right to "determine when and how their children are exposed to sexually explicit subject matter" is encompassed within their fundamental due process right to control their children's upbringing and their constitutional right to privacy to make intimate familial decisions. They argue that under both doctrines they have a fundamental right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" and that the defendants' actions infringing

---

[6]Subsequent to the district court's dismissal of the federal causes of action, the court also dismissed without prejudice the state law causes of action on jurisdictional grounds. The parent-appellants' opening brief does not renew their opposition to the district court's dismissal of the state law causes of action. Those issues are therefore waived. *See Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999) ("Arguments not raised in [an] opening brief are waived."). Of course, the parents may pursue the state law causes of action in state court.

that right are therefore subject to strict scrutiny. Finally, they maintain that even if the court concludes that the deprivation of their liberty interest in "control[ling] the upbringing of their children by introducing them to matters of and relating to sex" is not subject to strict scrutiny, the School District's administration of the psychological survey was not rationally related to a legitimate state end.

### A.   Meyer-Pierce

We note at the outset that it is not our role to rule on the wisdom of the School District's actions. That is a matter that must be decided in other fora. The question before us is simply whether the parents have a constitutional right to exclusive control over the introduction and flow of sexual information to their children. It is clear, and the parents agree, that no court has ever held that parents have a specific fundamental right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs." In fact, no such specific right can be found in the deep roots of the nation's history and tradition or implied in the concept of ordered liberty. *See Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Thus, whether the parents have a constitutional right to exclusive control over the introduction and flow of sexual information to their children depends entirely upon whether the asserted right is encompassed within some broader constitutional right.

[1] The parents next argue that the right they seek to invoke is encompassed within the fundamental due process right to "control the education and upbringing of one's children." The Supreme Court has held that the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment pro-

tects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). This right is commonly referred to as the *Meyer-Pierce* right because it finds its origin in two Supreme Court cases, *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).

**[2]** As with all constitutional rights, the right of parents to make decisions concerning the care, custody, and control of their children is not without limitations. In *Prince v. Massachusetts*, 321 U.S. 158 (1944), the Court recognized that parents' liberty interest in the custody, care, and nurture of their children resides "first" in the parents, but does not reside there *exclusively*, nor is it "beyond regulation [by the state] in the public interest." *Id.* at 166. For example, the state "as *parens patriae*" may restrict parents' interest in the custody, care, and nurture of their children "by requiring school attendance, regulating or prohibiting the child's labor and in many other ways." *Id.* (footnotes omitted). *See also Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (holding that there is no parental right to educate children in private segregated schools); *Norwood v. Harrison*, 413 U.S. 455, 461-62 (1973) (discussing the limited scope of *Pierce*); *Wisconsin v. Yoder*, 406 U.S. 205, 239 (1972) (White, J., concurring) (stating that the *Pierce* right "lends no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society"); *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare."); *Hooks v. Clark County Sch. Dist.*, 228 F.3d 1036, 1042 (9th Cir. 2000) (subjecting the *Meyer-*

*Pierce* right to reasonable regulation by the state), *cert. denied*, 532 U.S. 971 (2001).

Likewise, lower courts have recognized the constitutionality of a wide variety of state actions that intrude upon the liberty interest of parents in controlling the upbringing and education of their children. *See Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001) (upholding school district's mandatory school uniform policy); *Hooks*, 228 F.3d at 1036 (upholding state statute denying speech therapy services to home-schooled children); *Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) (plurality opinion) (upholding a municipality's curfew ordinance that was only applicable to minors); *Swanson v. Guthrie Indep. Sch. Dist. No. 1-L*, 135 F.3d 694 (10th Cir. 1998) (upholding school district's full-time attendance policy); *Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (4th Cir. 1996) (upholding school district's mandatory community service program).

Finally, there are a number of cases that have upheld the constitutionality of school programs that educate children in sexuality and health. *See, e.g., Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) (upholding school district's mandatory health classes against a father's claim of a violation of his fundamental rights); *Parents United for Better Sch., Inc. v. School Dist. of Philadelphia Bd. of Educ.*, 148 F.3d 260 (3d Cir. 1998) (upholding school district's consensual condom distribution program); *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525 (1st Cir. 1995) (upholding compulsory high school sex education assembly program); *Citizens for Parental Rights v. San Mateo County Bd. of Educ.*, 51 Cal. App. 3d 1 (1975) (upholding school district's non-compulsory health and sex education program against parental challenge).

**[3]** Of particular import to this case is *Brown*, in which a compulsory high school assembly presentation aimed at educating students on AIDS and other health concerns included

explicit references to sexuality. *See* 68 F.3d at 529. The *Brown* plaintiffs alleged that the compelled attendance of schoolchildren at the assembly deprived the minors and their parents of their privacy rights, substantive due process rights, and their right to an educational environment free from sexual harassment. Rejecting those claims, the First Circuit explained that,

> [t]he *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program — whether it be religious instruction at a private school or instruction in a foreign language. That is, the state does not have the power to "standardize its children" or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education. We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children. We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me." The first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children. If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter. We cannot see that the Constitution imposes such a burden on state educational systems, and accordingly find that the rights of parents as described by *Meyer* and *Pierce* do not encompass a

broad-based right *to restrict the flow of information* in the public schools.

*Id.* at 533-34 (citations omitted) (emphasis added). We agree with and adopt the First Circuit's analysis. *Meyer*, *Pierce*, and their progeny "evince the principle that the state cannot prevent parents from choosing a specific educational program," but they do not afford parents a right to compel public schools to follow their own idiosyncratic views as to what information the schools may dispense. Parents have a right to inform their children when and as they wish on the subject of sex; they have no constitutional right, however, to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so.

Neither *Meyer* nor *Pierce* provides support for the view that parents have a right to prevent a school from providing any kind of information — sexual or otherwise — to its students. As the *Brown* court said, "*Meyer* and *Pierce* do not encompass [the] broad-based right [the parent-plaintiffs seek] *to restrict the flow of information* in the public schools." *Id.* at 534. Although the parents are legitimately concerned with the subject of sexuality, there is no constitutional reason to distinguish that concern from any of the countless moral, religious, or philosophical objections that parents might have to other decisions of the School District — whether those objections regard information concerning guns, violence, the military, gay marriage, racial equality, slavery, the dissection of animals, or the teaching of scientifically-validated theories of the origins of life. Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent. Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy.

As the First Circuit made clear in *Brown*, once parents make the choice as to which school their children will attend,

their fundamental right to control the education of their children is, at the least, substantially diminished. The constitution does not vest parents with the authority to interfere with a public school's decision as to how it will provide information to its students or what information it will provide, in its classrooms or otherwise. *See Yoder*, 406 U.S. at 205. Perhaps the Sixth Circuit said it best when it explained, "While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child. Whether it is the school curriculum, the hours of the school day, school discipline, the timing and content of examinations, the individuals hired to teach at the school, the extracurricular activities offered at the school or, as here, a dress code, these issues of public education are generally 'committed to the control of state and local authorities.' " (citations omitted) (emphasis in original). *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005). We endorse and adopt the Sixth Circuit's view.[7]

The parents argue that the reasoning in *Brown* should not be followed in this case because the AIDS assembly being challenged in that case was part of the general curriculum, and there is a "curriculum exception" to the *Meyer-Pierce* right which supported that court's disposition of that case. The parents cite no case recognizing such a curriculum exception. They simply urge that we create one, and then hold that in all other respects *Meyer-Pierce* controls all matters relating to education and the educational system. That is not how the courts have analyzed the issue, *see, e.g., Blau*, and we see no reason to follow a different course.

**[4]** *Brown* and *Blau* compel the conclusion that what *Meyer-Pierce* establishes is the right of parents to be free from state interference with their choice of the educational

---

[7]We offer no comment as to any First Amendment issues that may arise with respect to any of these matters.

forum itself, a choice that ordinarily determines the type of education one's child will receive. The School District's design and administration of the survey in no way interfered with that right. Indeed, it was only because the parents had selected the school they did that their children were asked the questions to which the parents objected. The state action at issue simply does not fall within the *Meyer-Pierce* proscription.

In sum, we affirm that the *Meyer-Pierce* right does not extend beyond the threshold of the school door. The parents' asserted right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs," by which they mean the right to limit what public schools or other state actors may tell their children regarding sexual matters, is not encompassed within the *Meyer-Pierce* right to control their children's upbringing and education. Accordingly, *Meyer-Pierce* provides no basis for finding a substantive due process right that could have been violated by the defendants' authorization and administration of the survey.

### B.   *Privacy*

The parents argue alternatively that the right "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" is encompassed within their constitutional "right to privacy with respect to intimate decisions." The defendants argue that no such right to privacy exists independent of the substantive due process rights already analyzed, and that, in any event, any such right to privacy is not implicated by the state's actions here.

**[5]** The nature of the relationship between the privacy right protecting intimate decision-making and the *Meyer-Pierce* right is far from clear. The parents suggest that "the two separate rights are inextricably intertwined in modern constitu-

tional jurisprudence." Some courts, including the district court, have construed the two rights as one and the same when discussing a parent's privacy interest in controlling the upbringing and education of children. *See, e.g.*, *Brown*, 68 F.3d at 532-34. Both theories find their roots in substantive due process. To the extent that the two are "inextricably intertwined," the failure of the parents to state a claim under *Meyer-Pierce* disposes of their privacy argument. For purposes of this opinion, however, we will also analyze the privacy right separately.

Although the right to privacy provides a different source for the right the parents seek to assert than does *Meyer-Pierce*, like *Meyer-Pierce* it does not encompass that right. The Supreme Court has identified at least two constitutionally protected privacy interests: the right to control the disclosure of sensitive information and the right to "independence when making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977). The parents do not allege that their children were forced to disclose private information. Their argument here is only that the survey violated their own right to make important decisions regarding the manner and timing of exposing their children to sexual matters.[8]

**[6]** In its earliest formulation, the right to privacy was used essentially to protect the family structure. *See Pierce*, 268 U.S. at 510 (affirming family's right to be free from all but the most necessary state interference); *Meyer*, 262 U.S. at 390 (same). Courts have since found, however, that the right to privacy also protects important parental decisions such as whether to bear children, who has control over children, and other decisions related to procreative autonomy. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 684-86 (1977) (holding

---

[8]No claim is asserted that either the childrens' or the parent's rights were violated because the children were compelled to disclose personal or sensitive information. Thus, we do not consider any question of compulsory disclosure of such information here.

state's restrictions on sale of contraceptives an unconstitutional intrusion on the right to decide privately whether to have children); *Roe v. Wade*, 410 U.S. 113 (1973) (holding that the right to abortion falls within the right to privacy); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (affirming the equal rights of unmarried fathers to the custody of their children); *Eisenstadt v. Baird*, 405 U.S. 438, 453-54 (1972) (discussing privacy right to beget children). It also encompasses a right of sexual intimacy. *See Lawrence v. Texas*, 539 U.S. 558 (2003). We cannot overstate the significance of these rights. They symbolize the importance of our evolving understanding of the nature of our Constitution. *See* Stephen G. Breyer, *Active Liberty: Interpreting Our Democratic Constitution* (2005). Here, however, the survey simply did not interfere with the right of the parents to make intimate decisions. Making intimate decisions and controlling the state's determination of information regarding intimate matters are two entirely different subjects. No constitutional provision prohibits the dissemination of information to children, or to adults (unless it is the Treason Clause). Thus, the right of the parents "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" is not protected by the constitutional right to privacy, at least not as that purported right is understood by the parents in this case.

## C. Rational Basis Review

[7] Governmental actions that infringe upon a fundamental right receive strict scrutiny. *See Mullins v. Oregon*, 57 F.3d 789, 793 (9th Cir. 1995). However, government actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if it they are rationally related to a legitimate state interest. *See Vacco v. Quill*, 521 U.S. 793 (1997); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir.), *cert. denied*, 125 S. Ct. 56 (2004). Because we hold that the School District's administration of the survey did not violate a fundamental right, strict scrutiny does not

apply. We therefore review the parents' federal claims by applying the rational basis test. *Id.* We start from the premise that courts must be wary of "[j]udicial interposition in the operation of the public school system of the Nation." *Goss v. Lopez*, 419 U.S. 565, 578 (1975) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656-57 (1995); *Yoder*, 406 U.S. at 235; *Blau*, 401 F.3d at 393.

The parents offer two arguments with respect to our rational basis review. First, the complaint alleges on information and belief that there was no legitimate governmental purpose to the survey and that it was undertaken in order to benefit Seymour's academic career. The allegation is entirely speculative and conclusory in nature. No facts are offered in support of the parents' theory. Although in other circumstances we might dismiss such an allegation with leave to amend, it is apparent here that such a dismissal could not in the end aid the parents in stating a claim. Attached to the complaint is detailed information setting forth the legitimate governmental purpose of the survey and explaining with specificity how the information obtained will be used for educational purposes and how it will ultimately benefit the School District and its children. Given the inclusion in the complaint of this specific information establishing the legitimacy of the School District's action, we must, even for purposes of a motion to dismiss, approach the application of the rational basis test from the premise that the School District had a legitimate educational purpose in undertaking the survey.

The parents also argue that the survey cannot pass review because it was not a part of the school's curriculum, and information regarding sexual matters may be conveyed only as part of a student's academic studies. The curriculum argument also fails. First, neither education itself nor the legitimate functions of a public school are limited to the curriculum. *See Blau* discussed *supra* at pp. 15075-76 and adopted herein. Such a view construes too narrowly the aims

of education and fails to recognize the unique role that it plays in American society. *See Plyler v. Doe*, 457 U.S. 202, 221 (1982) (stating that public education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation"); *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring) (calling public education "a most vital civic institution for the preservation of a democratic system of government"). One need review only the Supreme Court's unanimous decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), for a reminder of the state's compelling interest in the broad ends of education, the scope of which extend far beyond "curriculum":

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Id.* at 493. In fine, education is not merely about teaching the basics of reading, writing, and arithmetic. Education serves higher civic and social functions, including the rearing of children into healthy, productive, and responsible adults and the cultivation of talented and qualified leaders of diverse backgrounds. *See Grutter v. Bollinger*, 539 U.S. 306 (2003). The defendants prepared the psychological survey as an "assessment [ ] to establish a community baseline measure of chil-

dren's exposure to early trauma." Protecting the mental health of children falls well within the state's broad interest in education.

Second, the psychological survey's ultimate objective was, according to an exhibit to the complaint, to improve students' ability to learn. The exhibit reveals that the survey was intended to gauge exposure to early trauma and to assist in designing an intervention program to help the School District reduce barriers to students' ability to learn. Although the students who were questioned may or may not have "learned" anything from the survey itself and may or may not have been "taught" anything by the questions they were asked, the facilitation of their ability to absorb the education the school provides is without question a legitimate educational objective. It is indeed more directly within the school's basic educational mission, than, for example, requiring students to wear uniforms or to participate in community service, both of which some courts have held constitutional. *See Littlefield*, 268 F.3d at 291 ("While [p]arents may have a fundamental right in the upbringing and education of their children, this right does not cover the [p]arents' objection to a public school Uniform Policy."); *Herndon*, 89 F.3d at 176 (requiring high school students to perform community service in order to graduate does not violate parents' right to control the education of their children). *See also Swanson*, 135 F.3d at 699 ("Federal courts addressing the issue have held that parents have no right to exempt their children from certain reading programs the parents found objectionable, or from a school's community-service requirement, or from an assembly program that included sexually explicit topics.") (citations omitted).

Finally, apart from any discussion of whether the survey was intended to aid the educational process, the questioning can also be justified on the basis of an alternative state interest — namely, *parens patriae*. *See Prince*, 321 U.S. at 166-67. The defendants argue that the survey was intended to gauge the mental health of the School District's students by "iden-

tify[ing] internal behaviors such as anxiety and depression and external behaviors such as aggression and verbal abuse." In this respect, the School District's interest in the mental health of its students falls well within the state's authority as *parens patriae*. As such, the School District may legitimately play a role in the care and nurture of children entrusted to them for schooling. *See id.* at 166 (ruling that the state "as *parens patriae*" may supplement or even in some circumstances supplant parents' interest in the custody, care, and nurture of their children "by requiring school attendance, regulating or prohibiting the child's labor and in many other ways") (citations omitted). *See also Parham v. J.R.*, 442 U.S. 584 (1979) (holding that a state's scheme for committing children to mental health care in state hospitals, when the child is the ward of the state, comported with due process); *Stanley*, 405 U.S. at 652 ("We do not question the assertion that neglectful parents may be separated from their children."); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (upholding state mandatory vaccination laws, as reasonable protection of public health and safety, against a parental challenge).

**[8]** Given the broad aims of education and the state's interest as *parens patriae*, there can be no question that the School District's interests in effective education and the mental health of its students are legitimate ends. *See Parham*, 442 U.S. at 603 ("[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized.") (citation omitted); *Hunter v. Regents*, 190 F.3d 1061, 1067 (9th Cir. 1999) ("California has a compelling interest in providing effective education . . . ."). Equally so, it is reasonable for the School District to believe that the students' answers to questions posed by its employee, who was trained in evaluating mental health, would aid the establishment of a district-wide intervention program to identify and treat barriers to learning caused by exposure to childhood trauma. Accordingly, the School District's administration of the survey was rationally

related to its legitimate state interest in effective education and the mental welfare of its students.

Although we reach our conclusions with little difficulty and firmly endorse the School District's authority to conduct a survey for the purposes involved here, we reiterate that we express no view on the wisdom of posing some of the particular questions asked or of conducting an inquiry into some of the particular areas surveyed by the School District. That determination is properly left to the school authorities.

## III.

In summary, we hold that there is no free-standing fundamental right of parents "to control the upbringing of their children by introducing them to matters of and relating to sex in accordance with their personal and religious values and beliefs" and that the asserted right is not encompassed by any other fundamental right. In doing so, we do not quarrel with the parents' right to inform and advise their children about the subject of sex as they see fit. We conclude only that the parents are possessed of no constitutional right to prevent the public schools from providing information on that subject to their students in any forum or manner they select. We further hold that a psychological survey is a reasonable state action pursuant to legitimate educational as well as health and welfare interests of the state. Accordingly, the parent-appellants have failed to state a federal claim upon which relief may be granted. The decision of the district court is affirmed.

**AFFIRMED.**