# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARGARET WITT, Major,
        *Plaintiff-Appellant,*

      v.

DEPARTMENT OF THE AIR FORCE;
ROBERT M. GATES,* Secretary of
Defense; MICHAEL W. WYNNE,
Secretary, Department of the Air
Force; MARY L. WALKER, Colonel,
Commander, 446th Aeromedical
Evacuation Squadron, McChord
AFB,
        *Defendants-Appellees.*

No. 06-35644

D.C. No.
CV-06-05195-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
November 5, 2007—Seattle, Washington

Filed May 21, 2008

Before: William C. Canby, Senior Circuit Judge,
Susan P. Graber, and Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Canby

---

*Robert M. Gates is substituted for his predecessor Donald H. Rumsfeld
as Secretary of Defense. Fed. R. App. P. 43(c)(2).

**COUNSEL**

James E. Lobsenz, Carney Badley Spellman, P.S., Seattle, Washington, for the appellant.

Aaron H. Caplan, ACLU of Washington, Seattle, Washington, for the appellant.

Peter Keisler, Attorney General, Department of Justice, Washington, DC, for the appellees.

Anthony J. Steinmeyer, Assistant Branch Director, Appellate Staff, Civil Division, Department of Justice, Washington, DC, for the appellees.

**OPINION**

GOULD, Circuit Judge:

Plaintiff-Appellant Major Margaret Witt ("Major Witt") sued the Air Force, the Secretary of Defense, the Secretary of the Air Force, and her Air Force commander ("the Air Force") after she was suspended from duty as an Air Force reservist nurse on account of her sexual relationship with a civilian woman. Major Witt alleges that 10 U.S.C. § 654, commonly known as the "Don't Ask, Don't Tell" policy ("DADT"), violates substantive due process, the Equal Protection Clause, and procedural due process. She seeks to

enjoin DADT's enforcement. The district court dismissed the suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. We reverse and remand in part, and affirm in part.

# I

Major Witt entered the Air Force in 1987.[1] She was commissioned as a Second Lieutenant that same year and promoted to First Lieutenant in 1989, to Captain in 1991, and to Major in 1999. In 1995, she transferred from active to reserve duty and was assigned to McChord Air Force Base in Tacoma, Washington.

By all accounts, Major Witt was an outstanding Air Force officer. She received medals for her service, including the Meritorious Service Medal, the Air Medal, the Aerial Achievement Medal, the Air Force Commendation Medal, and numerous others. Her annual "Officer Performance Reviews" commended her accomplishments and abilities. Major Witt was made an Air Force "poster child" in 1993, when the Air Force featured her in recruitment materials; photos of her appeared in Air Force promotional materials for more than a decade.

Major Witt was in a committed and long-term relationship with another woman from July 1997 through August 2003. Major Witt's partner was never a member nor a civilian employee of any branch of the armed forces, and Major Witt states that she never had sexual relations while on duty or while on the grounds of any Air Force base. During their relationship, Major Witt and her partner shared a home in Spokane, Washington, about 250 miles away from McChord Air

---

[1]Because the district court dismissed the suit below for failure to state a claim, we present and consider the facts as alleged by Major Witt in a light most favorable to her. *Miranda v. Clark County*, 319 F.3d 465, 468 (9th Cir. 2003) (en banc).

Force Base. While serving in the Air Force, Major Witt never told any member of the military that she was homosexual.

In July 2004, Major Witt was contacted by Major Adam Torem, who told her that he had been assigned to investigate an allegation that she was homosexual. She declined to make any statement to him. An Air Force chaplain contacted her thereafter to discuss her homosexuality, but she declined to speak to him, as well. In November 2004, Major Witt's Air Force superiors told her that they were initiating formal separation proceedings against her on account of her homosexuality. This was confirmed in a memorandum that Major Witt received on November 9, 2004. That memorandum also stated that she could not engage in any "pay or point activity pending resolution" of the separation proceedings. Stated another way, she could not be paid as a reservist, she could not earn points toward promotion, and she could not earn retirement benefits. When she received this memorandum, Major Witt was less than one year short of twenty years of service for the Air Force, at which time she would have earned a right to a full Air Force retirement pension.

Sixteen months later, on March 6, 2006, Major Witt received another memorandum notifying her that a discharge action was being initiated against her on account of her homosexuality. It also advised her of her right to request an administrative hearing, which she promptly did. On April 12, 2006, Major Witt filed this suit in the United States District Court for the Western District of Washington, seeking declaratory and injunctive relief from the discharge proceedings.

A military hearing was held on September 28-29, 2006. The military board found that Major Witt had engaged in homosexual acts and had stated that she was a homosexual in violation of DADT. It recommended that she be honorably discharged from the Air Force Reserve. The Secretary of the Air Force acted on this recommendation on July 10, 2007, ordering that Major Witt receive an honorable discharge.

Major Witt is well regarded in her unit, and she believes that she would continue to be so regarded even if the entire unit was made aware that she is homosexual. She also contends that the proceedings against her have had a negative effect on unit cohesion and morale, and that there is currently a shortage of nurses in the Air Force of her rank and ability. We must presume those facts to be true for the purposes of this appeal.[2]

## II

### A

We review de novo a dismissal for failure to state a claim. *Pruitt v. Cheney*, 963 F.2d 1160, 1162-63 (9th Cir. 1992).

DADT, 10 U.S.C. § 654, permits the discharge of members of the armed forces on account of homosexual activity. In relevant part, it provides:

> (b) Policy.—A member of the armed forces shall be separated from the armed forces under regulations prescribed by the Secretary of Defense if one or more of the following findings is made and approved

---

[2]Four *amicus* briefs were filed in this case. The International Commission of Jurists and the Center for Constitutional Rights wrote in support of Major Witt and argued that the United States Supreme Court has recognized a fundamental privacy right and that the international legal trend is toward legal equality for homosexuals. The Lambda Legal Defense and Education Fund also supported Major Witt and argued that the Supreme Court has recognized a fundamental right to sexual identity and that the district court undervalued the value of the liberty interest at stake in the case. The Servicemembers Legal Defense Network wrote in support of Major Witt and argued that the rationale for DADT is not compelling and that DADT forces homosexual service members to hide their identity to avoid discharge. The National Legal Foundation wrote in support of the Air Force and argued that DADT has a valid purpose of supporting unit cohesion, reducing sexual tension, and protecting privacy. We appreciate the advice of all amici on the important issues before us.

in accordance with procedures set forth in such regulations:

(1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that—

(A) such conduct is a departure from the member's usual and customary behavior;

(B) such conduct, under all the circumstances, is unlikely to recur;

(C) such conduct was not accomplished by use of force, coercion, or intimidation;

(D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and

(E) the member does not have a propensity or intent to engage in homosexual acts.

(2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

(3) That the member has married or attempted to marry a person known to be of the same biological sex.

*Id.*

Major Witt argues that DADT violates substantive due process, the Equal Protection Clause, and procedural due process. The Ninth Circuit has considered and rejected similar claims in the past, *see*, *e.g.*, *Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126, 1136 (9th Cir. 1997) (rejecting an Equal Protection Clause challenge to DADT under rational basis review); *Philips v. Perry*, 106 F.3d 1420, 1425-26 (9th Cir. 1997) (same); *Beller v. Middendorf*, 632 F.2d 788, 805-12 (9th Cir. 1980) (rejecting procedural due process and substantive due process challenges to a Navy regulation forbidding homosexual service in the Navy). However, Major Witt argues that *Holmes*, *Philips*, and *Beller* are no longer dispositive in light of *Lawrence v. Texas*, 539 U.S. 558 (2003), in which the Supreme Court struck down a Texas statute that banned homosexual sodomy. Accordingly, to resolve this appeal, we must consider the effect of *Lawrence* on our prior precedents.

**B**

**[1]** We first assess whether Major Witt has standing to pursue this action. "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations, footnote, and quotation marks omitted). Second, plaintiff must present a "causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and brack-

ets omitted). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561.

**[2]** There is little doubt that Major Witt meets the second and third requirements, if she can meet the first requirement—an actual injury from DADT. There are, however, questions about whether she has suffered an actual injury for Article III purposes. Although Major Witt has been suspended, the military board recommended her discharge, and the Secretary of the Air Force ordered her discharge, she has not been formally discharged from the military, as far as the record before us shows. Accordingly, at least some of Major Witt's claims are unripe because they rely on harms which may or may not actually occur. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted))

**[3]** We conclude that Major Witt meets the Article III requirements for her substantive due process and equal protection claims. Although she has not been discharged formally, Major Witt suffered a cognizable injury on account of her long-term suspension. In addition to the loss of pay and points toward promotion and retirement benefits, Major Witt asserts in a declaration in the record that her suspension seriously harmed her chances of being promoted to Colonel. This injury is sufficient to establish "actual injury" for Article III purposes.

**[4]** However, the situation is different for Major Witt's procedural due process claim. Major Witt does not allege that she has been deprived of life or a property interest. Her procedural due process claim rests on her assertion that her discharge papers will reflect the reasons for her discharge, and that this in turn will result in a stigma. The record indicates that Major Witt will receive an honorable discharge. We have

suggested that an honorable discharge could be stigmatizing if prospective employers had some reason to know of the reasons for the honorable discharge. *See Beller*, 632 F.2d at 807 (rejecting claim that an honorable discharge resulted in stigma because there was "no evidence indicating that the plaintiffs' service records [we]re likely to impose stigma upon them or make it more difficult for them to seek post-discharge employment"). However, the record does not reflect what will appear on her discharge certificate and, thus, whether any stigma will occur.[3] Accordingly, the procedural due process claim is not ripe for adjudication on this record because the injury that Major Witt asserts may or may not occur. *See Paul v. Davis*, 424 U.S. 693, 708-10 (1976) (holding that "defamation, standing alone" does not suffice for a stigma-plus claim; there must be "a right or status previously recognized by state law [that] was distinctly altered or extinguished").

[5] We hesitate to dismiss the claim at this stage, however, because the factual situation surrounding Major Witt's discharge may have changed in the course of this appeal. We therefore remand the procedural due process claim to the district court, where the court can consider the factual details of her discharge with more complete and current information.

---

[3]Major Witt relies on a number of cases that have involved "suspension" to support her claim that her liberty has already been violated by her suspension pending a final discharge. However, all of those cases involved property interests. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("It is undisputed that appellee's interest in the right to continue to serve as president of the bank and to participate in the conduct of its affairs is a property right protected by the Fifth Amendment Due Process Clause."); *Barry v. Barchi*, 443 U.S. 55, 64 (1979) ("[I]t is clear that Barchi had a property interest in his license sufficient to invoke the protection of the Due Process Clause."); *United States v. Two Hundred Ninety-Five Ivory Carvings*, 689 F.2d 850, 853 (9th Cir. 1982) ("Since its summary seizure and during the entire period of the delay, Segal has been deprived of his property without an impartial hearing concerning the seizure."). The plaintiffs in each of those cases had a property right that was actively infringed by a delayed hearing. Here, Major Witt alleges only a right to be free of a stigma that may or may not occur, and which is not currently present.

## III

To evaluate Major Witt's substantive due process claim, we first must determine the proper level of scrutiny to apply. In previous cases, we have applied rational basis review to DADT and predecessor policies. *See, e.g., Holmes*, 124 F.3d at 1136; *Philips*, 106 F.3d at 1425-26. However, Major Witt argues that *Lawrence* effectively overruled those cases by establishing a fundamental right to engage in adult consensual sexual acts. The Air Force disagrees. Having carefully considered *Lawrence* and the arguments of the parties, we hold that *Lawrence* requires something more than traditional rational basis review and that remand is therefore appropriate.

## A

[6] In *Lawrence*, the Supreme Court struck down a Texas statute that criminalized consensual homosexual sodomy. 539 U.S. at 578. In doing so, it also overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986), a 1986 decision of the Supreme Court that had upheld a Georgia law criminalizing consensual sodomy. The Court in *Lawrence* noted that "broad statements of the substantive reach of liberty under the Due Process Clause" can be found in earlier cases, including *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), *Meyer v. Nebraska*, 262 U.S. 390 (1923), and, most pertinently, in *Griswold v. Connecticut*, 381 U.S. 479 (1965). *Lawrence*, 539 U.S. at 564. "After *Griswold*," the Court wrote, "it was established that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship." *Id.* at 565.

Turning to *Bowers*, the Court recognized "the Court's own failure to appreciate the extent of the liberty at stake" in that case. *Id.* at 567. The Court explained:

> To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct [as the Court did in *Bowers*] demeans the claim the individual put for-

ward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals.

*Id.*

The Court then discussed the reach of its decision, summarizing:

This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects. It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice.

*Id.*

[7] The Supreme Court then provided additional reasons why it was overruling *Bowers*. First, the Court explained, *Bowers* was predicated on the erroneous belief that homosex-

uality was "subject to state intervention throughout the history of Western civilization." *Id.* at 571 (internal quotation marks omitted). Second, the logic in *Bowers* "demean[ed] the lives of homosexual persons" and had been widely rejected by state courts and international tribunals. *Id.* at 575-76.

The Supreme Court concluded:

> [Homosexuals'] right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992). The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

*Id.* at 578.

## B

Major Witt argues that *Lawrence* recognized a fundamental right to engage in private, consensual, homosexual conduct and therefore requires us to subject DADT to heightened scrutiny. The Air Force argues that *Lawrence* applied only rational basis review, and that the Ninth Circuit's decisions in *Holmes, Philips*, and *Beller* remain binding law on DADT's validity. Because *Lawrence* is, perhaps intentionally so, silent as to the level of scrutiny that it applied, both parties draw upon language from *Lawrence* that supports their views.

Major Witt argues that the "plain language" of *Lawrence* demonstrates that heightened scrutiny is required here. She notes that, in *Lawrence*, the Supreme Court relied on *Griswold*, 381 U.S. 479, *Roe v. Wade*, 410 U.S. 113 (1973), and *Carey v. Population Services International*, 431 U.S. 678

(1977), all of which are fundamental rights cases. She also observes that the language of *Lawrence* emphasizes the importance of the right at issue and refers to "substantial protections" afforded "adult persons in deciding how to conduct their private lives in matters pertaining to sex." "Substantial protections" are not afforded under rational basis review, Major Witt argues, because rational basis review considers only whether the challenged policy is rationally related to a legitimate state interest.

In response, the Air Force argues that the same "plain language" implies only rational basis review. In particular, the Air Force stresses the passage in *Lawrence* that states that the challenged statute "further[ed] no *legitimate state interest* which can justify its intrusion into the personal and private life of the individual," 539 U.S. at 578 (emphasis added). According to the Air Force, legitimate interests are the hallmark of rational basis review. The Air Force also notes that *Lawrence* never stated that it was applying anything other than rational basis review, so, the Air Force concludes, it surely was not.

**1**

As a preliminary matter, the Air Force argues that no court to date has held that *Lawrence* applied a heightened level of scrutiny. However, the situation is more complex than that presented by the Air Force. Although the Air Force argues that "every Article III court to have decided th[e] question [whether *Lawrence* applied heightened scrutiny], including three courts of appeals, agreed with the District Court in this case that Lawrence applied rational-basis review, meaning that the case did not implicate a fundamental right," that is not the case. As we see it, only one court of appeals has directly considered the issue.

The first case that the Air Force claims "decided this question," *Sylvester v. Fogley*, 465 F.3d 851 (8th Cir. 2006), is

discussed at length in its brief. However, the Eighth Circuit explicitly declined to address the issue in *Sylvester*. *See id*. at 858 ("[W]e need not determine whether Sylvester's sexual conduct is protected as a fundamental privacy right because we would reach the same result applying either the strict-scrutiny standard of review or the rational-basis standard of review."). The Seventh Circuit made a similar disclaimer in the next case that the Air Force discusses, *Muth v. Frank*, 412 F.3d 808 (7th Cir. 2005), which addressed the issue only in dicta. In *Muth*, the court said:

> It may well be that future litigants will insist that *Lawrence* has broader implications for challenges to other state laws criminalizing consensual sexual conduct. However, because this case is here on habeas review, the only question before this court is whether *Lawrence* announced a new rule proscribing laws prohibiting the conduct for which Muth was convicted [, incest].

*Id.* at 818. The court concluded that *Lawrence*'s holding did not apply to the activity in question—incest—and, thus, did not consider the level of scrutiny applied in *Lawrence. Id.*

Only one of the three courts of appeals that the Air Force claims to have "decided this question" actually has done so. In *Lofton v. Secretary of the Department of Children & Family Services*, 358 F.3d 804, 817 (11th Cir. 2004), the Eleventh Circuit upheld a law that forbade homosexuals from adopting children, explicitly holding that *Lawrence* did not apply strict scrutiny. Otherwise, our sister circuits are silent.

Nor have we previously directly considered the implications of *Lawrence*. In *Fields v. Palmdale School District*, 427 F.3d 1197, 1208 (9th Cir. 2005), we noted that the right to privacy "encompasses a right of sexual intimacy." (Citing *Lawrence*.) However, we concluded that the action at issue in *Fields*, a survey of elementary school children that included

questions relating to sex, did not interfere with the right of parents to make intimate decisions. *Id.* Accordingly, we did not apply *Lawrence,* whatever the level of scrutiny it might require.[4]

One other court of note has considered the implications of *Lawrence.* In *United States v. Marcum*, 60 M.J. 198 (C.A.A.F. 2004), the United States Court of Appeals for the Armed Forces considered a challenge to an Air Force sodomy law brought by a serviceman who had been convicted of consensual sodomy with a man of inferior rank within his chain of command. That court concluded that the application of *Lawrence* must be addressed "in context and not through a facial challenge." *Id.* at 206. *Lawrence*, the court concluded, did not identify a fundamental right; however, it required "searching constitutional inquiry." *Id.* at 205. The court distilled this inquiry into a three-step analysis:

> First, was the conduct that the accused was found guilty of committing of a nature to bring it within the liberty interest identified by the Supreme Court? Second, did the conduct encompass any behavior or factors identified by the Supreme Court as outside the analysis in *Lawrence*? Third, are there additional factors relevant solely in the military environment that affect the nature and reach of the *Lawrence* liberty interest?

*Id.* at 206-07 (citation omitted).

The Court of Appeals for the Armed Forces, in our view,

---

[4]The Air Force states that, in *Hensala v. Department of the Air Force*, 343 F.3d 951 (9th Cir. 2003), Judge Tashima held that *Lawrence* and *Holmes* "are not closely on point" so that "*Holmes* remains the law of the land." However, Judge Tashima wrote only a partial dissent in that case. *See id.* at 959 n.1 (Tashima, J., dissenting in part). The panel majority held that it need not reach the issue. *Id.* at 959 (majority opinion).

applied a heightened level of scrutiny. By considering whether the policy applied properly to a particular litigant, rather than whether there was a permissible application of the statute, the court necessarily required more than hypothetical justification for the policy—all that is required under rational basis review. The court also required consideration of "additional factors" that might justify the policy, which might be viewed as a corollary to the requirement that a challenged policy serve a "compelling" or "important" government interest under traditional forms of heightened scrutiny.

With this mixed background, we now turn to our analysis of *Lawrence*.

**2**

The parties urge us to pick through *Lawrence* with a fine-toothed comb and to give credence to the particular turns of phrase used by the Supreme Court that best support their claims. But given the studied limits of the verbal analysis in *Lawrence*, this approach is not conclusive. Nor does a review of our circuit precedent answer the question; as the Court of Appeals for the Armed Forces stated in *Marcum*, 68 M.J. at 204, "[a]lthough particular sentences within the Supreme Court's opinion may be culled in support of the Government's argument, other sentences may be extracted to support Appellant's argument." In these ambiguous circumstances, we analyze *Lawrence* by considering what the Court actually *did*, rather than by dissecting isolated pieces of text. In so doing, we conclude that the Supreme Court applied a heightened level of scrutiny in *Lawrence.*

**[8]** We cannot reconcile what the Supreme Court did in *Lawrence* with the minimal protections afforded by traditional rational basis review. First, the Court overruled *Bowers*, an earlier case in which the Court had upheld a Georgia sodomy law under rational basis review. If the Court was undertaking rational basis review, then *Bowers* must have been wrong

because it failed under that standard; namely, it must have lacked "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). But the Court's criticism of *Bowers* had nothing to do with the basis for the law; instead, the Court rejected *Bowers* because of the "Court's own failure to appreciate the extent of the liberty at stake." *Lawrence*, 539 U.S. at 567.

The criticism that the Court in *Bowers* had misapprehended "the extent of the liberty at stake" does not sound in rational basis review. Under rational basis review, the Court determines whether governmental action is so arbitrary that a rational basis for the action cannot even be conceived *post hoc*. If the Court was applying that standard—"a paradigm of judicial restraint," *Beach*, 508 U.S. at 314—it had no reason to consider the extent of the liberty involved. Yet it did, ultimately concluding that the ban on homosexual sexual conduct sought to "control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals." *Lawrence*, 539 U.S. at 567. This is inconsistent with rational basis review.

[9] Second, the cases on which the Supreme Court explicitly based its decision in *Lawrence* are based on heightened scrutiny. As Major Witt pointed out, those cases include *Griswold*, *Roe*, and *Carey*. Moreover, the Court stated that *Casey*, a post-*Bowers* decision, cast its holding in *Bowers* into doubt. *Lawrence*, 539 U.S. at 573-74. Notably, the Court did not mention or apply the post-*Bowers* case of *Romer v. Evans*, 517 U.S. 620 (1996), in which the Court applied rational basis review to a law concerning homosexuals. Instead, the Court overturned *Bowers* because "[i]ts continuance as precedent demeans the lives of homosexual persons." *Lawrence*, 539 U.S. at 575.

[10] Third, the *Lawrence* Court's rationale for its holding— the inquiry analysis that it was applying—is inconsistent with

rational basis review. The Court declared: "The Texas statute furthers no legitimate state interest *which can justify its intrusion into the personal and private life of the individual*." *Id.* at 578 (emphasis added). Were the Court applying rational basis review, it would not identify a legitimate state interest to "justify" the particular intrusion of liberty at issue in *Lawrence*; regardless of the liberty involved, any hypothetical rationale for the law would do.

**[11]** We therefore conclude that *Lawrence* applied something more than traditional rational basis review. This leaves open the question whether the Court applied strict scrutiny, intermediate scrutiny, or another heightened level of scrutiny. Substantive due process cases typically apply strict scrutiny in the case of a fundamental right and rational basis review in all other cases. When a fundamental right is recognized, substantive due process forbids the infringement of that right "at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 392, 301-02 (1993) (emphasis omitted). Few laws survive such scrutiny, and DADT most likely would not.[5] However, we hesitate to apply strict scrutiny when the Supreme Court did not discuss narrow tailoring or a compelling state interest in *Lawrence*, and we do not address the issue here.

**[12]** Instead, we look to another recent Supreme Court case that applied a heightened level of scrutiny to a substantive due process claim—a scrutiny that resembles and expands upon the analysis performed in *Lawrence*.[6] In *Sell v. United States*,

---

[5]The rationale for DADT is found at 10 U.S.C. § 654(a)(15), which states Congress's finding that:

> The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

[6]Although we agree with the Eleventh Circuit that the *Lawrence* Court did not apply strict scrutiny, *Lofton*, 358 F.3d at 817, in our view, the

539 U.S. 166, 179 (2003), the Court considered whether the Constitution permits the government to forcibly administer antipsychotic drugs to a mentally-ill defendant in order to render that defendant competent to stand trial. The Court held that the defendant has a "significant constitutionally protected liberty interest" at stake, so the drugs could be administered forcibly "only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Id.* at 178-80 (internal quotation marks omitted).

**[13]** Although the Court's holding in *Sell* is specific to the context of forcibly administering medication, the scrutiny employed by the Court to reach that holding is instructive. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (holding that we are bound by the theory or reasoning underlying a Supreme Court case, not just by its holding). The Court recognized a "significant" liberty interest—the interest "in avoiding the unwanted administration of antipsychotic drugs"—and balanced that liberty interest against the "legitimate" and "important" state interest "in providing appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others."[7] *Sell*, 539 U.S. at 178 (internal quotation marks omitted). To balance those two interests, the Court required the state to justify its intrusion into an individual's recognized liberty interest against forcible medication—just as *Lawrence* determined that the state had failed to "justify its intrusion into the

Eleventh Circuit failed to appreciate both the liberty interest recognized by *Lawrence* and the heightened-scrutiny balancing employed by *Lawrence*.

[7]This inquiry is similar to intermediate scrutiny in equal protection cases. *See Craig v. Boren*, 429 U.S. 190, 197 (1976) ("To withstand constitutional challenge, . . . classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.").

personal and private life of the individual." *Lawrence*, 539 U.S. at 578.

The heightened scrutiny applied in *Sell* consisted of four factors: First, a court must find that *important* governmental interests are at stake. . . .

> Courts, however, must consider the facts of the individual case in evaluating the Government's interest . . . . Special circumstances may lessen the importance of that interest. . . .

> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests. . . .

> Third, the court must conclude that involuntary medication is *necessary* to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. . . .

> Fourth, . . . the court must conclude that administration of the drugs is *medically appropriate* . . . .

539 U.S. at 180-81. The fourth factor is specific to the medical context of *Sell*, but the first three factors apply equally here. We thus take our direction from the Supreme Court and adopt the first three heightened-scrutiny *Sell* factors as the heightened scrutiny balancing analysis required under *Lawrence*. We hold that when the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest. In other words, for the third factor, a less intrusive means must be unlikely to achieve substantially the government's interest. *See also*

*Aptheker v. Sec'y of State*, 378 U.S. 500, 508 (1964) ("Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." (internal quotation marks omitted)).

**[14]** In addition, we hold that this heightened scrutiny analysis is as-applied rather than facial. "This is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments." *City of Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 447 (1985). In *Cleburne*, the Court employed a "type of 'active' rational basis review," *Pruitt*, 963 F.2d at 1165-66, in requiring the city to justify its zoning ordinance as applied to the specific plaintiffs in that case. And *Sell* required courts to "consider the facts of the individual case in evaluating the Government's interest." 539 U.S. at 180. Under this review, we must determine not whether DADT has some hypothetical, post-hoc rationalization in general, but whether a justification exists for the application of the policy as applied to Major Witt. This approach is necessary to give meaning to the Supreme Court's conclusion that "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." *Lawrence*, 539 U.S. at 572.

We also conclude that our holding in *Beller*, 632 F.2d 788, that a predecessor policy to DADT survived heightened scrutiny under the Due Process Clause, is no longer good law.[8]

---

[8]Our observation in *High Tech Gays v. Def. Ind. Security Clearance Office*, 895 F.2d 563, 572 (9th Cir. 1990), that "*Beller* has since been overruled by [*Bowers v.*] *Hardwick*," does not end our *Beller* inquiry. *Bowers* overruled *Beller*'s invocation of heightened scrutiny. *See Bowers*, 478 U.S. at 194-95 (rejecting heightened scrutiny for classifications based on homosexuality); *see also High Tech Gays*, 895 F.2d at 572 ("Neither *Beller* nor *Hatheway*[ *v. Sec'y of Army*, 641 F.2d 1376 (9th Cir. 1981),] is binding authority on us regarding heightened scrutiny for classifications based on homosexuality."). But *Bowers* did not necessarily alter *Beller*'s holding that the regulation at issue survived heightened scrutiny.

In *Beller*, 632 F.2d at 807 n.19, we applied heightened scrutiny because "[t]he kind of all-or-nothing substantive due process approach . . . d[id] not, we think, reflect the complexity of the Court's [due process] analysis." We reasoned

> that substantive due process scrutiny of a government regulation involves a case-by-case balancing of the nature of the individual interest allegedly infringed, the importance of the government interests furthered, the degree of infringement, and the sensitivity of the government entity responsible for the regulation to more carefully tailored alternative means of achieving its goals.

*Id.* at 807. We recognized "that there [wa]s substantial academic comment which argue[d] that the choice to engage in homosexual action is a personal decision entitled, at least in some instances, to recognition as a fundamental right and to full protection as an aspect of the individual's right of privacy." *Id.* at 809. But we held that "the importance of the government interests furthered . . . outweigh[ed] whatever heightened solicitude is appropriate for consensual private homosexual conduct." *Id.* at 810.

**[15]** Although the heightened scrutiny employed in *Beller* was prescient of *Lawrence, Sell,* and the three factors that we adopt today, in *Beller* we explicitly declined to perform an as-applied analysis. We acknowledged that, "[u]nder the analysis described in our opinion, individual treatment in some circumstances might be required by substantive due process, depending on the outcome of the balancing test." *Id.* at 808 n.20. But we refused to apply individual treatment because of "the relative impracticality at th[at] time of achieving the Government's goals by regulations which turn more precisely on the facts of an individual case." *Id.* at 810. *Beller*'s refusal to perform an as-applied balancing test is clearly irreconcilable with the individualized balancing analysis required under

*Cleburne* and *Sell*.[9] *Beller*'s heightened scrutiny analysis and holding therefore have been effectively overruled by intervening Supreme Court authority.[10] *See Miller*, 335 F.3d at 900 ("We hold that the issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable. . . . In future cases of such clear irreconcilability, a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.").

Here, applying heightened scrutiny to DADT in light of current Supreme Court precedents, it is clear that the government advances an important governmental interest. DADT

---

[9]*Beller*'s conclusion that individualized determination were "impractical" at that time has also since been placed into question by the Court of Appeals for the Armed Forces' decision in *Marcum*, where the court held that the application of *Lawrence* must be addressed "in context and not through a facial challenge." 60 M.J. at 206. Although that court's decision does not bind our panel, it is telling that the *Marcum* court did not find it "impractical" to consider particularized facts in each case. *See Middendorf v. Henry*, 425 U.S. 25, 43 (1976) (noting that military courts' judgments "are normally entitled to great deference" when "[d]ealing with areas of law peculiar to the military branches.").

[10]Other intervening Supreme Court decisions have also weakened the rationale of *Beller*. In *Pruitt*, 963 F.2d at 1165, we noted that "one of the justifications offered by the Navy in *Beller* was the tension between known homosexuals and other members who despise/detest homosexuality." (Internal quotation marks omitted.) We held that "[t]his justification accepted in *Beller* . . . should not be given unexamined effect today as a matter of law" because it was inconsistent with the Supreme Court's decisions in *Palmore v. Sidoti*, 466 U.S. 429 (1984), and *Cleburne*, 473 U.S. 432, that " '[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.' " *Pruitt*, 963 F.2d at 1165 (quoting *Palmore*, 466 U.S. at 433). However, *Pruitt* noted that, in *Beller*, "we held that there were several grounds on which the regulation could be upheld," *Pruitt*, 963 F.2d at 1164, only one of which was impacted by *Palmore* and *Cleburne*, so *Pruitt* does not end our inquiry.

concerns the management of the military, and "judicial defer-ence to . . . congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981). Notably, "deference does not mean abdi-cation." *Id.* "Congress, of course, is subject to the require-ments of the Due Process Clause when legislating in the area of military affairs . . . ." *Weiss v. United States*, 510 U.S. 163, 176 (1994).

**[16]** However, it is unclear on the record before us whether DADT, as applied to Major Witt, satisfies the second and third factors. The Air Force attempts to justify the policy by relying on congressional findings regarding "unit cohesion" and the like, but that does not go to whether the application of DADT specifically to Major Witt significantly furthers the government's interest and whether less intrusive means would achieve substantially the government's interest.[11] Remand therefore is required for the district court to develop the record on Major Witt's substantive due process claim. Only then can DADT be measured against the appropriate constitu-tional standard.

## IV

**[17]** We next turn to Major Witt's Equal Protection Clause claim. She argues that DADT violates equal protection because the Air Force has a mandatory rule discharging those who engage in homosexual activities but not those "whose presence may also cause discomfort among other service members," such as child molesters. However, *Philips* clearly

---

[11]Indeed, the facts as alleged by Major Witt indicate the contrary. Major Witt was a model officer whose sexual activities hundreds of miles away from base did not affect her unit until the military initiated discharge pro-ceedings under DADT and, even then, it was her suspension pursuant to DADT, not her homosexuality, that damaged unit cohesion.

held that DADT does not violate equal protection under rational basis review, 106 F.3d at 1424-25, and that holding was not disturbed by *Lawrence*, which declined to address equal protection, *see* 539 U.S. at 574-75 (declining to reach the equal protection argument and, instead, addressing "whether *Bowers* itself ha[d] continuing validity"). We thus affirm the district court's dismissal of Major Witt's equal protection claims.

## V

The issues posed by this case might generate great concern both from those who welcome Major Witt's continued participation in the Air Force and from those who may oppose it. Those issues must be, and have been, addressed in the first instance by leaders of the military community and by those in Congress with law-making responsibilities. All of Congress's laws must abide by the United States Constitution, however. Taking direction from what the Supreme Court decided in *Lawrence* and *Sell*, we hold that DADT, after *Lawrence*, must satisfy an intermediate level of scrutiny under substantive due process, an inquiry that requires facts not present on the record before us.

In light of the foregoing, we **VACATE** and **REMAND** the district court's judgment with regard to Major Witt's substantive due process claim and procedural due process claim, and **AFFIRM** with regard to the equal protection clause claim. The parties shall bear their own costs on appeal.

CANBY, Circuit Judge, concurring in part and dissenting in part:

The majority has written an opinion that is very praiseworthy as far as it goes. I concur in Parts I and II. I also concur in the first portion of Part III, to the end of subdivision (1).

Beyond that, I agree substantially with the majority's discussion leading to the conclusion that the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003), applied something more rigorous than traditional rational basis review in striking down Texas's criminalization of sexual relations between members of the same sex. Finally, I agree that the district court erred in dismissing the complaint for failure to state a substantive due process claim, and that we must remand for further proceedings. Unlike the majority, however, I would also reverse the dismissal of the equal protection claim. But where I differ most from the majority is in the level of scrutiny to be applied to both claims. In my view, the so-called "Don't Ask, Don't Tell" statute,[1] 10 U.S.C. § 654, must be subjected to strict scrutiny. Under that standard, the Air Force must demonstrate that the statute's restriction of liberty, and its adverse classification of homosexuals, are "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

### Substantive Due Process

As the majority opinion correctly recognizes, the Supreme Court's opinion in *Lawrence* never unambiguously states what standard of review it is applying. The *Lawrence* opinion leaves no doubt at all, however, about the importance of the right it is protecting. In discussing the flaws of *Bowers v. Hardwick*, 478 U.S. 186 (1986), which it was overruling, *Lawrence* explained:

> To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse.

---

[1] Under the facts alleged in the complaint, the statute's popular name appears to be a misnomer as applied to Major Witt. She did not tell, but the Air Force asked.

> The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control *a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals.*
>
> This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects. It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. *The liberty protected by the Constitution allows homosexual persons the right to make this choice.*

*Lawrence*, 539 U.S. at 567 (emphases added). Two points shine forth from this passage and its context in *Lawrence*: first, the right to choose to engage in private, consensual sexual relations with another adult is a human right of the first order and, second, that right is firmly protected by the substantive guarantee of privacy—autonomy of the Due Process Clause. Thus, even though the Court did not expressly characterize the right as "fundamental," it certainly treated it as such. It is this treatment, and the important individual values of liberty it recognizes, that require strict scrutiny of governmental encroachment on that right. In my view, therefore, *Lawrence* itself mandates strict scrutiny of the "Don't Ask, Don't Tell" statute.

In order to apply strict scrutiny, however, we do not need to satisfy ourselves that *Lawrence* commands or expressly adopts that standard of review. We are not reviewing a state criminal conviction, where we are forbidden by the Antiterrorism and Effective Death Penalty Act from applying a constitutional standard unless it has been determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). In the present context, it is enough that the question is an open one. As the majority opinion recognizes, *Lawrence* avoids (carefully, it seems) stating what standard of review the Court was applying. Certainly nothing in *Lawrence* can reasonably be read as *forbidding* the application of strict scrutiny to statutes attaching severe consequences to homosexual behavior.[2] The question of the standard of scrutiny in this case is therefore an open one, and we must address it according to our best understanding of the individual constitutional rights and governmental action involved.[3] For reasons that should already be apparent from my quotation and discussion of *Lawrence*, I have no difficulty concluding that the right to engage in homosexual relationships and related private sexual conduct is a personal right of a high constitutional order, and that the "Don't Ask, Don't Tell" statute so penalizes that relationship and conduct that it must be subjected to strict scrutiny.

---

[2]In that regard, *Lawrence* is to be contrasted with cases of gender discrimination, where the Supreme Court has expressly specified an intermediate standard of review. *See Craig v. Boren*, 429 U.S. 190, 197 (1976).

[3]For reasons explained in the following section on equal protection, I do not regard our earlier precedents applying lesser standards of scrutiny to military discrimination against homosexuals as binding after *Lawrence*. *See, e.g., Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir. 1980) (upholding Navy policy of discharging homosexuals even though regulation is "perhaps broader than necessary"); *Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126, 1132-36 (9th Cir. 1997) (upholding "Don't Ask, Don't Tell" policy under equal protection rational basis review); *Philips v. Perry*, 106 F.3d 1420, 1425-29 (9th Cir. 1997) (same).

### *Equal Protection*

Major Witt presented an equal protection claim to the district court, but acknowledges here that such a claim was rejected by our court in *Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997). Although she does not pursue it before our three-judge panel, she does preserve her right to assert the claim in the event she seeks en banc review of our decision; she has not abandoned the claim.[4]

I do not believe that *Philips* ties our hands. *Philips* applied rational basis review to an equal protection attack on the "Don't Ask, Don't Tell" policy of the Navy. It did so on the authority of our earlier decision in *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563 (9th Cir. 1990). *See Philips*, 106 F.3d at 1425. *High Tech Gays*, however, was based on the proposition that it would be inappropriate to apply strict scrutiny to classifications targeting homosexuals when the Supreme Court had held in *Bowers* that homosexual conduct could be made a crime. *See High Tech Gays*, 895 F.2d at 571 ("[I]f there is no fundamental right to engage in homosexual sodomy . . . *see* [*Bowers v.*] *Hardwick*, . . . it would be incongruous . . . to find a fundamental right of homosexual conduct under the equal protection component of the Due Process Clause of the Fifth Amendment."). Because *Lawrence* unequivocally overruled *Bowers*, it "undercut the theory [and] reasoning underlying" *High Tech Gays* and *Philips* "in such a way that the cases are

---

[4]Major Witt does urge upon us a different kind of equal protection claim. She contends that the Air Force violates equal protection because it requires automatic discharge of sexually active homosexuals on the ground that they are offensive to some members of a military unit, while others equally offensive, such as child molesters, are not categorically subject to discharge. *See* AFI 36-3209, ¶ 2.29.10. Like the majority, I find it unnecessary to address this argument. I also conclude that it would accomplish too little to establish that persons availing themselves of their constitutional right to intimate homosexual relations should be treated at least as well as child molesters.

clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). I am therefore convinced that *Philips* is no longer controlling.[5]

An equal protection analysis applying strict scrutiny to the "Don't Ask, Don't Tell statute is accordingly open to us. There are two different approaches to strict scrutiny under equal protection analysis, and both should be followed in this case.

The most direct path to strict scrutiny of the statute under the equal protection principle is to hold that classifications discriminating against homosexuals are "suspect," like classifications based on race. *See Loving v. Virginia*, 388 U.S. 1, 11 (1967) (subjecting race-based miscegenation statute to strict scrutiny under the Equal Protection Clause). I have long been convinced that classifications against homosexuals are suspect in the equal protection sense, but I was unable to persuade a majority of my colleagues to embark on en banc review to establish that proposition. *See High Tech Gays v. Defense Industrial Security Clearance Office*, 909 F.2d at 376-80 (1990) (Canby, J., dissenting from denial of rehearing en banc). As I have already explained, however, the overruling of *Bowers* by *Lawrence* has undermined *High Tech Gays.* We accordingly are free to revisit the question whether the adverse classification of homosexuals is "suspect" under equal protection analysis. My reasons for concluding that such classifications are suspect are fully set out in my dissent from denial of en banc review in *High Tech Gays*, and I will not belabor the matter here. Suffice it to say that homosexuals have "experienced a history of purposeful unequal treatment [and] been subjected to unique disabilities on the basis of ste-

---

[5]In *Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126, 1132 (9th Cir. 1997), we also applied rational basis review to reject an equal protection challenge to a component of the "Don't Ask, Don't Tell" policy, relying on *Philips* and *High Tech Gays*. For the reasons just discussed, *Lawrence*'s overruling of *Bowers* undermines *Holmes* as well.

reotyped characteristics not truly indicative of their abilities." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (internal quotation marks omitted). They also "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are [ ] a minority." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986). In short, they are a group deserving of protection against the prejudices and power of an often-antagonistic majority.

The Supreme Court's decision in *Romer v. Evans*, 517 U.S. 620 (1996), is not a barrier to a suspect classification, strict scrutiny approach. In that case, the Court struck down a Colorado constitutional provision prohibiting, among other things, any anti-discrimination legislation protecting homosexuals. *Id.* at 623-24. The Supreme Court noted that most laws involve a classification and that, if no fundamental right or suspect class is involved, statutes are subject only to rational basis review. *Id.* at 631. The Court then stated that the Colorado provision

> fails, indeed defies, *even this* conventional inquiry. First, the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation.

*Id.* at 632 (emphasis added). Thus the Court had no need to address whether homosexuals constituted a suspect class because the Colorado provision failed "even" rational basis review. That ruling does not negate the application of higher levels of scrutiny on similar classifications. Indeed, the strong language of *Romer* suggests that the invidiousness of the legislation would have supported any standard of review as a path to its invalidation. *Romer*, like *Lawrence*, does not forbid the application of strict scrutiny, even though it may have found that level of scrutiny unnecessary to invalidate the legislation before the Court in that case.

In addition to the avenue of a suspect classification, there is another path to strict scrutiny under equal protection analysis. Classifications that impinge on a fundamental right are subject to strict scrutiny when challenged as a violation of equal protection. *See, e.g., Dunn v. Blumstein*, 405 U.S. 330, 337-39 (1972). As I have already explained, *Lawrence* effectively establishes a fundamental right without so labeling it. At the very least, *Lawrence* leaves the question open, to permit us to recognize the fundamental right to homosexual relations as I have already insisted we must. Even though that right justifies strict scrutiny under a theory of substantive due process, there are good reasons for adding an equal protection analysis in this case. It is true that, in *Lawrence*, the Supreme Court elected not to employ an equal protection theory. 539 U.S. at 574-75. It recognized, however, that equal protection provided a "tenable" basis for declaring the statute invalid, and conceded that a decision recognizing a liberty interest in certain conduct advanced the cause of equality as well as due process. *Id.* at 575. The reason why the Court in *Lawrence* did not employ an equal protection analysis was itself protective. The Court stated that it would not sufficiently establish the right to intimate homosexual relations if only equal protection were invoked, because a state might frustrate the right by denying heterosexuals as well as homosexuals the right to non-marital sexual relations. *See id.*

The danger of an end-run remedy of equal treatment is not severe in our case, however. I doubt that the armed services are likely to respond to an invalidation of the "Don't Ask, Don't Tell" statute as a violation of equal protection by decreeing the automatic discharge of any member, heterosexual or homosexual, who is found to have engaged in sexual relations outside of marriage. In any event, we can guard against any such result by retaining our substantive due process analysis along with an equal protection approach.

The reason for including an equal protection analysis is that there is a very clear element of discrimination in the whole

"Don't Ask, Don't Tell" apparatus, and an equal protection analysis focuses the inquiry sharply on a question that should not be ignored: what compelling interest of the Air Force is narrowly served by discharging homosexuals but not others who engage in sexual relations privately off duty, off base, and with persons unconnected to the military? It is no answer to such a question that the known presence of a sexually active homosexual in a military unit necessarily creates sexual tensions (if indeed that could be shown), unless it were also demonstrated that the presence of heterosexuals in a military unit created no comparable tensions. It is also not a sufficient answer that many military personnel are biased against homosexuals. *See Pruitt v. Cheney*, 963 F.2d 1160, 1165 (9th Cir. 1992); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."); *Romer*, 517 U.S. at 634-35. There are other requirements of narrow tailoring that would apply during further proceedings applying strict scrutiny, but the point now is that part of the inquiry should address the clear discrimination between homosexuals and heterosexuals, and determine whether that discrimination is necessary to serve a compelling governmental interest and sweeps no more broadly than necessary.

### *Order of Inquiry in Further Proceedings*

The inquiry on remand should focus first on the Air Force's justification for its impingement on the right to private intimate sexual relations and the compelling nature of any interest that is served by that measure. The Air Force should be required to identify a compelling interest with sufficient specificity so that the relation between the "Don't Ask, Don't Tell" statute and that policy can be evaluated. It is difficult to accomplish that goal if the compelling interest is as broadly stated as "management of the military" or, say, "winning wars." Moreover, under strict scrutiny, it is not enough that

the interest be merely "served" by the challenged legislation; the legislation must be *necessary* to that purpose, and must sweep no more broadly than is essential to serve the governmental purpose. *See Dunn*, 405 U.S at 345-46, 351-52.

Thus, as a matter of due process, the Air Force can be required to show why there is a compelling need to discharge homosexuals who have been sexually active outside of their duty station with persons unconnected to the military and why the measure it has adopted is narrowly tailored to the satisfaction of that compelling need. As a matter of equal protection, the Air Force can be asked to show what compelling need is narrowly served by treating homosexuals who are sexually active off duty and outside the military context differently from heterosexuals who are sexually active off duty and outside the military context. These requirements are case-specific in that they reflect the alleged facts that Major Witt conducted all of her relations with her female partner off-base, and her partner was alleged not to be in or employed by the military. If the Air Force cannot meet these requirements, the statute must be invalidated in such applications.

There are clear advantages to addressing the Air Force's justifications first, before any inquiry into the personal characteristics and situation of Major Witt in her unit. First, requiring the Air Force to make the requisite showing as a threshold matter may end the case.

Second, the inquiry directed toward the Air Force is less potentially disruptive than a focus on Major Witt herself and, particularly, the allegedly favorable attitude toward her on the part of other members of her unit. To require unit members to testify or submit affidavits concerning the degree to which they do or do not consider themselves adversely affected by the presence of a known, sexually active homosexual, may

constitute a distraction from regular duties. It is better to employ such an inquiry only as a last resort.[6]

Finally, requiring the Air Force to justify the application of the statute to a generic service member who carries on a homosexual relationship and intimate conduct away from the duty station and its personnel provides more protection of the constitutional right set forth in *Lawrence.* Because the right to choose to engage in private, intimate sexual conduct is a constitutional right of a high order, it must be protected not just for the outstanding service member like Major Witt, but also for the run-of-the-mill airman or soldier. It is thus the general application of the statute to the generic service member that the Air Force must be required to justify. In *Lawrence*, after all, the Supreme Court struck down the statute as applied to anyone engaging in homosexual conduct; it did not find it necessary or relevant to inquire into whether the individual conduct of which the petitioners had been convicted was more or less offensive to the interests of the State under the circumstances of its occurrence.

### Conclusion

The majority opinion represents a conscientious effort to reach a just result in this case, and I agree with much of its analysis. I conclude, however, that the Air Force must demon-

---

[6]For this reason, even if I were to accept the majority's standard of scrutiny, I would modify its remand instructions now directed to determining whether "the application of DADT specifically to Major Witt significantly furthers the government's interest . . . ." *Supra* p. 5867. Further proceedings should begin by requiring the Air Force to show what important governmental interest is significantly furthered by the statute. The only facts concerning Major Witt that need to be developed at that point are that her homosexual relationship was carried on off-duty, away from military premises, with a person unconnected to the military. The Air Force must then demonstrate why it is necessary to apply the statute to a service member in those circumstances. Further details of Major Witt's individual circumstances would best be left to the end, and may be unnecessary.

strate that the "Don't Ask, Don't Tell" statute meets the requirements of strict scrutiny—that it is necessary to serve a compelling governmental interest and that it sweeps no more broadly than necessary. I also conclude that the Air Force must be required to do so for purposes of both substantive due process and equal protection. I therefore respectfully dissent in part from the majority opinion.