# Department of Defense Response to Interlocutory Decision of Court of Appeals Regarding Statute Requiring Separation of Homosexual Service Members from Military

Following the interlocutory decision of a court of appeals regarding the statute requiring the separation of certain gay and lesbian service members from the military, the Department of Defense is not legally required to revise its administrative procedures and policies in a manner that might preclude separations within the circuit that would otherwise be mandated by the statute.

The Department of Defense is also not legally prohibited from acquiescing in the decision, although such a policy would appear to lack direct Executive Branch precedent and arguably would be in some tension with the Executive Branch's usual practice of implementing and defending statutes that are subject to constitutional challenge.

March 25, 2010

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF DEFENSE

You have asked for our views regarding the Department of Defense's implementation of 10 U.S.C. § 654—the statute establishing the government's policy with respect to the separation of gay and lesbian service members from the military—in the wake of the U.S. Court of Appeals for the Ninth Circuit's decision in *Witt v. Department of the Air Force*, 527 F.3d 806 (2008). In particular, you have asked whether *Witt* requires the Department of Defense ("DoD" or the "Department") to revise its administrative procedures and policies governing the application of section 654 "within the Ninth Circuit"[1] so long as that decision remains binding circuit law. You have also asked whether, even if *Witt* does not require this result, the Department may acquiesce in the *Witt* ruling by revising those procedures and policies in a manner that might preclude separations within the Ninth Circuit that would otherwise be mandated by section 654. Our view is that DoD is neither legally required to acquiesce in *Witt* in such a manner nor legally prohibited from doing so.[2] We caution,

---

[1] Our references in this memorandum to cases "within" the Ninth Circuit are meant to encompass cases in which service members could challenge their separation in federal district courts bound to apply Ninth Circuit precedent.

[2] We note that 28 U.S.C. § 530D requires executive agencies to submit a report to Congress when, among other things, they establish or implement a policy to refrain (i)

however, that such a policy of acquiescence would appear to lack direct Executive Branch precedent and arguably would be in some tension with the Executive Branch's usual practice of implementing and defending statutes that are subject to constitutional challenge. Moreover, to ensure the legal permissibility of any particular policy of acquiescence implemented by DoD, it would be necessary for us to review the precise details of that policy.

## I.

In *Witt*, the Ninth Circuit reversed a federal district court's dismissal of a constitutional challenge to section 654 brought by Major Margaret Witt, an Air Force officer who was about to be discharged for violating the statute. Section 654 provides in subsection (a) that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15) (2006). Subsection (b) then provides that "[a] member of the armed forces *shall be separated from the armed forces* under regulations prescribed by the Secretary of Defense if one or more of the following findings is made and approved in accordance with procedures set forth in such regulations." *Id.* § 654(b) (emphasis added). The referenced findings are:

> (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are further findings, made and approved in accordance with procedures set forth in such regulations, that the member has demonstrated that—
>
> > (A) such conduct is a departure from the member's usual and customary behavior;

---

"from enforcing, applying, or administering" a statutory provision "on the grounds that such provision is unconstitutional" and (ii) "within any judicial jurisdiction," "from adhering to, enforcing, applying, or complying with[] any standing rule of decision" of a federal court of, or superior to, that jurisdiction "respecting the interpretation, construction, or application of the Constitution." 28 U.S.C. § 530D(a)(1)(A)(i), (ii), (e) (2006). We would be happy to assist you in determining whether any particular policy that you might establish regarding section 654 would require a report under these provisions.

(B) such conduct, under all the circumstances, is unlikely to re-cur;

(C) such conduct was not accomplished by use of force, coer-cion, or intimidation;

(D) under the particular circumstances of the case, the mem-ber's continued presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and

(E) the member does not have a propensity or intent to engage in homosexual acts.

(2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

(3) That the member has married or attempted to marry a person known to be of the same biological sex.

*Id.*

Acting in accord with DoD procedures promulgated pursuant to section 654(b), the Air Force initiated formal separation proceedings against Major Witt in 2004, resulting in her suspension. In 2006, a military re-view board found that Major Witt had engaged in homosexual acts and had stated that she was a homosexual in violation of section 654. *See Witt*, 527 F.3d at 810. The board therefore recommended that she be honorably discharged from the Air Force Reserve, and in 2007 the separa-tion authority, the Secretary of the Air Force, ordered that she receive such a discharge. *See id.* Major Witt then challenged her suspension and prospective discharge in federal district court on federal constitutional grounds.

The district court rejected Major Witt's claim that section 654 violated her rights under the substantive component of the Due Process Clause of the Fifth Amendment after evaluating that claim under a rational basis standard of review. *Witt v. Dep't of the Air Force*, 444 F. Supp. 2d 1138 (W.D. Wash. 2006). Major Witt then appealed to the Ninth Circuit, which vacated and remanded the district court's substantive due process ruling

for further proceedings. *Witt*, 527 F.3d at 809.[3] In its decision, the Ninth Circuit deemed rational basis review inapt in light of the Supreme Court's decision in *Lawrence v. Texas*, 539 U.S. 558 (2003), and held instead that "when the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest." *Witt*, 527 F.3d at 819. The court also held that "this heightened scrutiny analysis is as-applied rather than facial," and thus requires a court to "determine not whether [section 654] has some hypothetical, post hoc rationalization in general, but whether a justification exists for the application of the policy as applied to Major Witt." *Id.*

Applying a three-part heightened scrutiny test, the *Witt* court observed that the government had advanced "an important governmental interest"—namely, "the management of the military"—to which courts owed deference, but concluded that it was unclear "whether [section 654], as applied to Major Witt, satisfies the second and third factors" of the test. *Id.* at 821. In particular, the court noted that the Air Force's reliance on congressional findings regarding "'unit cohesion' and the like" did "not go to whether the application of [section 654] specifically to Major Witt significantly furthers the government's interest and whether less intrusive means would achieve substantially the government's interest."[4] *Id.* Accordingly, the court remanded the case "for the district court to develop the record on Major Witt's substantive due process claim," at which point it could be determined whether her separation under section 654, "measured against

---

[3] The Ninth Circuit also vacated and remanded the district court's dismissal of Major Witt's procedural due process claim and affirmed the district court's dismissal of her equal protection claim. 527 F.3d at 812–13, 821–22. Those claims are not relevant to the subject of your request, and we do not discuss them further.

[4] In a footnote, the court briefly touched on whether the government would be able to satisfy the second and third factors of the heightened scrutiny test, noting Major Witt's allegations that she "was a model officer whose sexual activities hundreds of miles away from base did not affect her unit until the military initiated discharge proceedings under [section 654] and [that], even then, it was her suspension pursuant to [section 654], not her homosexuality, that damaged unit cohesion." *Witt*, 527 F.3d at 821 n.11.

the appropriate constitutional standard," was permissible. *Id.* The court did not order the United States to take any action.

Subsequent to its order, the Ninth Circuit denied the government's petition for rehearing en banc, *Witt v. Dep't of the Air Force*, 548 F.3d 1264 (2008), and the Solicitor General then declined to seek Supreme Court review of the panel decision. In a letter to Speaker of the House Nancy Pelosi submitted under section 530D of title 28, U.S. Code, the Attorney General explained the decision not to seek review as based on "the longstanding presumption against Supreme Court review of interlocutory decisions as well as practical litigation considerations." Letter for Nancy Pelosi, Speaker, U.S. House of Representatives, from Eric H. Holder, Jr., Attorney General, *Re: Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir. 2008) (Apr. 22, 2009) ("530D Letter"). Among the "practical considerations" the Attorney General identified in his letter were the desirability of "develop[ing] . . . the factual record on remand" to ensure "a more complete basis" for ultimate Supreme Court review. The letter also noted that DoD's views with respect to seeking immediate Supreme Court review were consistent with those expressed in the letter and that, in particular, DoD had identified similar practical considerations that counseled against seeking such review. Finally, the Attorney General noted that "[t]he government retains all rights to petition the Supreme Court to review a final decision in the case, including every aspect of the Ninth Circuit's ruling, after proceedings on remand are completed." At present, the case is pending before the district court on remand.

## II.

The first question we must address is whether, for as long as the *Witt* court's due process framework remains the governing law of the Ninth Circuit, DoD is required to apply that framework in implementing section 654 in cases within the Ninth Circuit. The argument that such "intracircuit acquiescence" is required is rooted in a claim about the separation of powers. One of the leading precedents for such an argument is *Lopez v. Heckler*, 725 F.2d 1489, 1497 & n.5 (9th Cir. 1984), *vacated on other grounds and remanded*, 469 U.S. 1082 (1984). In that case, the Ninth Circuit stated that the refusal of the Social Security Administration ("SSA") to give effect to prior circuit precedent interpreting the statutory

procedures governing the termination of social security benefits "under-mine[s] what are perhaps the fundamental precepts of our constitutional system—the separation of powers and respect for the law." 725 F.2d at 1497; *see also id.* at 1502 n.10 ("with regard to recipients whose benefits were terminated after [the governing court of appeals decisions] became final the Secretary also violated her constitutional duty to execute the law faithfully"); *id.* at 1503 ("That the Secretary, as a member of the executive, is required to apply federal law as interpreted by the federal courts cannot seriously be doubted."); *Johnson v. U.S. R.R. Ret. Bd.*, 969 F.2d 1082, 1091–92 (D.C. Cir. 1992) (citing cases "condemn[ing]" intracircuit nonacquiescence). The Ninth Circuit, however, has not been entirely consistent on this issue, stating in a pre-*Lopez* case (one that *Lopez* did not address) that the Immigration and Naturalization Service ("INS") "could refuse to" acquiesce in a decision of the U.S. Court of Appeals for the Second Circuit—*Lok v. INS*, 548 F.2d 37 (2d Cir. 1977)—"in the Second Circuit and thereby achieve consistency of application," while noting that "to do so would only invite appeal and reversal." *Castillo-Felix v. INS*, 601 F.2d 459, 467 (9th Cir. 1979).

In our view, DoD is not required to acquiesce in the *Witt* decision, notwithstanding that *Witt* will govern any litigation in the Ninth Circuit unless and until that decision is vacated or reversed. As explained below, this conclusion accords with the longstanding position of this Office, and the consistent, publicly declared position of the Executive Branch, that an executive agency may "nonacquiesce" in a court of appeals ruling—a practice whereby the agency, despite an adverse court of appeals decision, continues to act in accordance with its own contrary interpretation of the law with respect to persons who were not parties to the judgment. The Executive Branch's traditional view that nonacquiescence is permissible includes even "intracircuit" nonacquiescence, or nonacquiescence in situations where the adversely affected persons could challenge the administrative decision in a case that would be governed by the law established by the relevant adverse court of appeals decision.[5] Accordingly, we

---

[5] *See, e.g., Federal Agency Compliance Act: Hearing on H.R. 1544 Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 105th Cong. 43 (1997) (statement of Stephen W. Preston, Deputy Assistant Attorney General, Civil Division) ("Preston Testimony"); *see generally* Samuel Estreicher & Richard L.

do not believe that DoD must modify its procedures and policies in order to ensure that section 654 separations of individuals who are within the Ninth Circuit, but who are not parties to the *Witt* judgment, satisfy the heightened standard of review that *Witt* at present requires judges in the Ninth Circuit to apply in reviewing such separations.

## A.

In the usual case of intracircuit acquiescence, the circuit court decision at issue concerns the proper interpretation of a federal statute, and the agency acquiesces even though it may remain of the view that its own contrary interpretation of the statute is correct and even though it may fully intend to continue pressing that interpretation in future cases. As a matter of federal practice, executive agencies generally do engage in intracircuit acquiescence in such cases, even when they continue to challenge the adverse precedent in other circuits or await a test case for reconsideration in the circuit of decision. *See* Preston Testimony, *supra* note 5, at 43. Such intracircuit acquiescence often serves interests in comity and sound policy. With respect to the latter, the practice can ensure that private persons are not deprived of the benefits of a court of appeals precedent that would protect them "if they have the fortitude to run an administrative gauntlet" and challenge the Executive's decision in a court that is bound to apply that precedent. *Johnson*, 969 F.2d at 1093; *see also Lopez v. Heckler*, 572 F. Supp. 26, 30 (C.D. Cal. 1983), *stay denied*, 713 F.2d 1432 (9th Cir. 1983), *partial stay granted*, 463 U.S. 1328 (1983) (Rehnquist, Circuit Justice), *motion to vacate stay denied*, 464 U.S. 879 (1983), *dist. court aff'd in part and rev'd in part*, 725 F.2d 1489 (9th Cir. 1984), *vacated on other grounds and remanded*, 469 U.S. 1082 (1984) (mem.) ("If [a social security] claimant has the determination and the financial and physical strength and lives long enough to make it through the administrative process, he can turn to the courts and ultimately expect them to apply the law as announced [by the Circuit]. If exhaustion overtakes him and he falls somewhere along the road leading to such ultimate relief, the nonacquiescence and the resulting termination stand. Particularly with

---

Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679, 692–718 (1989) (describing agency practice).

respect to . . . individuals whose resources . . . are . . . relatively limited, such a dual system of law is prejudicial and unfair.").

Notwithstanding the general practice of discretionary agency acquiescence in adverse court of appeals rulings, however, this Office and the Executive Branch have, as noted, long been of the view that an agency is not legally compelled to engage in intracircuit acquiescence. Certainly, such acquiescence is not required by any statute addressing the practice;[6] and, as the Department of Justice ("DOJ") has consistently maintained, it also is not required by the separation of powers.[7]

---

[6] In 1984, both the House and Senate passed provisions regulating nonacquiescence by the SSA in their versions of the legislation that became the Social Security Disability Benefits Reform Act, Pub. L. No. 98-460, 98 Stat. 1794 (1984). But the Act as finally enacted did not address the subject and, although the House report and the conference report accompanying the Reform Act examined the practice of nonacquiescence and raised concerns about its propriety, both the House and Senate expressly declined to express definitive views regarding the practice's constitutionality. *See* H.R. Rep. No. 98-1039, at 37–38 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3080, 3095–96 (noting that "questions have been raised about the constitutional basis of non-acquiescence," but concluding that "the legal and Constitutional issues raised by non-acquiescence can only be settled by the Supreme Court"); H.R. Rep. No. 98-618, at 25 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3038, 3062 (stating that "the issue of the constitutionality of the non-acquiescence policy may be in doubt"); *see also* 130 Cong. Rec. 25,977 (1984) (statement of Senator Dole on behalf of the Senate) ("While some of the conferees have expressed strong reservations regarding [nonacquiescence by the Department of Health and Human Services ('HHS') in administering the Social Security Act], it should be made clear for the record that it is not the position of the Senate that the practice is unconstitutional as exercised by [HHS] or as by any other Federal agency."). In 1998, the House passed a bill that would have generally required agencies to follow controlling circuit precedent, *see* Federal Agency Compliance Act, H.R. 1544, 105th Cong. § 2(a) (as passed by House, Feb. 25, 1998) (providing, with certain exceptions, that "an agency . . . shall, in administering a statute, rule, regulation, program, or policy within a judicial circuit, adhere to the existing precedent respecting the interpretation and application of such statute, rule, regulation, program, or policy, as established by the decisions of the United States court of appeals for that circuit"), but the Senate declined to follow suit and no law was enacted. The House report accompanying this bill stated that the framework for agency acquiescence that the bill would create "is consistent with the principle of separation of powers under which it is the courts' constitutional role to interpret the laws governing agency actions," but the report did not declare nonacquiescence unconstitutional. H.R. Rep. No. 105-395, at 7 (1997).

[7] *See Federal Agency Compliance Act: Hearing on H.R. 1924 Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 106th Cong. 16 (1999) (statement of William B. Schultz, Deputy Assistant Attorney General, Civil

To be sure, unlike the usual case giving rise to acquiescence, the ruling in *Witt* interprets the Constitution. Some commentators have suggested that intracircuit acquiescence in a constitutional ruling by a court of appeals may be constitutionally compelled, even if nonacquiescence in statutory decisions is permissible. *See* Estreicher & Revesz, 98 Yale L.J. at 720 n.214 ("The status of nonacquiescence in a constitutional interpretation presents a much more troubling question"); *see also id.* at 731 n.261 (suggesting that nonacquiescence might be "always improper . . . with agency disagreements over constitutional rulings"). So far as we are aware, however, there is no precedent for an agency announcing a policy of acquiescence in a court of appeals decision declaring a federal statute invalid on constitutional grounds in the precise circumstances present here—i.e., where the United States continues to assert that the statute is constitutional and has reserved its right to continue defending the statute's constitutionality, and where opportunities for subsequent review of the decision at issue are not exhausted. Moreover, the numerous statements setting forth DOJ's view of the permissibility of nonacquiescence have not distinguished between nonacquiescence in statutory rulings and nonacquiescence in constitutional ones. Instead, DOJ's position—that intracircuit nonacquiescence is a constitutionally permissible course of action—has long been cast in more general terms. And that is true as well of the limited Supreme Court case law that bears on the issue.

## B.

Although it is true that "Article III establishes a 'judicial department' with the 'province and duty . . . to say what the law is,'" Article III, Section 2 of the Constitution also expressly provides that this authority

---

Division) (stating the Department's well-established view that "the doctrine of separation of powers does not bar a federal agency from declining to apply the legal reasoning of a particular court of appeals decision in the agency's further administration of a statutory program outside the context of the particular case in which the court rendered its decision"); *see also* Preston Testimony, *supra* note 5, at 42; Memorandum for James M. Spears, Acting Assistant Attorney General, Office of Legal Policy, from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Correspondence with Administrative Law Judges* at 11–14 (June 19, 1985); Letter for Robert Dole, Chairman, Senate Finance Committee, from Rex E. Lee, Solicitor General (May 7, 1984), *entered into the congressional record at* 130 Cong. Rec. 25,977 (1984) ("Lee Letter").

extends to "particular cases and controversies." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).[8] Consistent with this limitation, the Supreme Court held in *United States v. Mendoza*, 464 U.S. 154 (1984), that the government was not foreclosed by the doctrine of "nonmutual collateral estoppel" from relitigating a legal issue it had previously litigated unsuccessfully in another action against a different party, even when the prior litigation had occurred in the same judicial circuit. In explaining its holding, the Court observed that "many constitutional questions can arise only in the context of litigation to which the Government is a party," and "[a] rule allowing nonmutual collateral estoppel against the Government . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 160. The Court also noted that the application of nonmutual estoppel against the government would have the undesirable consequences of (i) forcing the Solicitor General, "in order to avoid foreclosing further review," to abandon prudential considerations in favor of "appeal[ing] every adverse decision [to the Supreme Court]," and (ii) permitting the policy decisions of one administration to unduly constrain a later one. *Id.* at 161. As the Court had observed previously in *United States v. Estate of Donnelly*, "[t]he United States, like other parties, is entitled to adhere to what it believes to be the correct interpretation of a statute, and to reap the benefits of that adherence if it proves to be correct, except where bound to the contrary by a final judgment in a particular case." 397 U.S. 286, 294–95 (1970).

---

[8] We recognize that in *Cooper v. Aaron*, 358 U.S. 1 (1958), the Supreme Court observed that *Marbury* had "declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution, and that [that] principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system." *Id.* at 18. That statement does not contradict our conclusion that nonacquiescence would be permissible here, if only because the *Witt* decision was rendered by a court of appeals rather than by the Supreme Court, and the latter plays a "special role" in our constitutional system in "resolving disputes about the constitutionality of enactments." *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994); *cf. Plaut*, 514 U.S. at 227 (noting that because Article III creates "not a batch of unconnected courts, but a judicial department composed of 'inferior Courts' and 'one supreme Court,'" the decision of an inferior court "is not (unless the time for appeal has expired) the final word of the department as a whole").

Of course, the Court's recognition in *Mendoza* of the government's authority to relitigate an issue lost in a prior case does not necessarily imply that an agency may decline to conform its conduct to a court of appeals decision in exercising its administrative authority with respect to nonparties within that circuit. But *Mendoza*, together with the relevant language from *Donnelly*, reflects the importance the Court ascribes to affording the government wide berth to contest federal judicial decisions and to "control[] the progress of Government litigation through the federal courts." *Mendoza*, 464 U.S. at 161. And DOJ has relied upon both considerations in justifying nonacquiescence as an acceptable legal practice. *See* Preston Testimony, *supra* note 5, at 43 (legislation "[p]rescribing fixed, across-the-board standards for determining when nonacquiescence is appropriate is antithetical to the flexibility needed in deciding which cases to appeal to the Supreme Court and which legal issues to continue litigating in the lower courts"); *see also* Lee Letter, 130 Cong. Rec. at 25,977 (stating that regulation of nonacquiescence by House version of the Reform Act would have had "serious adverse implications for the conduct of the government's litigation in the Social Security context").[9]

Moreover, the Ninth Circuit's ruling in *Witt* was set forth in an interlocutory order, and the Attorney General expressly noted in the 530D Letter that the decision not to appeal it at that time reflected a recognition of the Supreme Court's reluctance to review such interlocutory decisions. Interlocutory judgments by their nature do not definitively resolve a case. In this instance, for example, at least if the district court determines that the statute is invalid as applied and the Ninth Circuit upholds this decision on appeal, the government will be able to "raise any and all of its arguments in defense of the statute in a petition for a writ of certiorari seeking review of the final judgment." 530D Letter. Thus, the Ninth Circuit's decision in *Witt* is not "final" in the sense that the government will not be able under any circumstances to seek further review of that decision by the Supreme Court. The Court explained the relevant meaning of "finality" in *Plaut*:

---

[9] Indeed, the action that gave rise to the litigation in *Mendoza* was a decision by an administrative official that was inconsistent with the unappealed ruling of a district court, thus demonstrating the close connection between nonacquiescence and the ability of the government to relitigate the underlying issue. *See* Estreicher & Revesz, 98 Yale L.J. at 686.

> [A] distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial department composed of "inferior Courts" and "one supreme Court." Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole.

514 U.S. at 227.

Indeed, the Department of Justice specifically has observed that "[i]n such cases [involving interlocutory court of appeals decisions], nonacquiescence may be entirely appropriate." Preston Testimony, *supra* note 5, at 45. Moreover, the conference report that Congress issued in enacting the Social Security Disability Benefits Reform Act of 1984, Pub. L. No. 98-460, 98 Stat. 1794, stated the view that "a policy of non-acquiescence be followed only in situations where the Administration has initiated or has the reasonable expectation and intention of initiating the steps necessary to receive a review of the issue in the Supreme Court." H.R. Rep. No. 98-1039, at 37. Thus, even if nonacquiescence might raise legal concerns in certain instances, we do not believe that it would do so here.[10]

## III.

We next consider whether, given that acquiescence in the *Witt* decision is not legally required, it could be undertaken in a legally permissible

---

[10] We acknowledge that nonacquiescence in this case, in addition to resulting in the likelihood that courts within the Ninth Circuit would enjoin separations that are not *Witt*-conforming, might present some additional litigation risk. For example, we cannot foreclose the possibility that a court might assess attorney's fees against DoD under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2006). *See, e.g.*, *Hyatt v. Heckler*, 807 F.2d 376, 382 (4th Cir. 1986); Preston Testimony, *supra* note 5, at 46 ("any time it decides not to acquiesce, an agency runs the risk of not only losing on the merits, but also being held liable for attorney's fees [under the EAJA]"). A ruling against the government for a non-*Witt*-conforming separation might also provide the basis for a court to issue an injunction prohibiting nonacquiescence with respect to a much broader certified class of plaintiffs. *See, e.g.*, *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *Lopez*, 572 F. Supp. at 31–32. We express no view of the merits of any such claims, but simply identify the possibility that a decision not to acquiesce could itself be the subject of litigation.

manner. The issue arises because you have asked us to consider whether DoD could lawfully establish a policy of acquiescing in *Witt* within the Ninth Circuit through the revision of existing policies and procedures governing section 654 separations. Presumably, the effect of such a revision would be to preclude the separation authority from effecting separations within the Ninth Circuit that section 654 standing alone would require, but that would not satisfy the heightened substantive due process standard announced in *Witt*.

In our view, such a course of action could constitute a lawful means of acquiescing in the *Witt* decision, although the permissibility of any particular policy of acquiescence would of course depend on the details of that policy. Our conclusion that acquiescence in *Witt* could be undertaken in a lawful manner follows from the Executive's longstanding view that acquiescence is a permissible practice and the absence of any indication in precedents of the Executive Branch or the judiciary that acquiescence is impermissible where an agency conforms its conduct to a court of appeals' constitutional decision in a manner that may result in the agency's declining to follow statutory requirements as to a class of cases. We caution, however, that we are aware of no precedent in executive branch practice that is precisely on point with the policy you have asked us to consider—i.e., an agency's establishment of a categorical policy of intracircuit acquiescence in a constitutional ruling that might result in the agency acting contrary to statutory requirements while options for obtaining further review of the ruling in the case at issue remain potentially unexhausted. We further caution that our conclusion regarding the permissibility of acquiescence is limited to the implementation of policies and procedures tailored to ensuring that separations satisfy the *Witt* standard. Thus, modification of the policies and procedures governing separation proceedings within the Ninth Circuit for purposes of acquiescing in *Witt* should be temporary and contingent on further developments in the case.

### A.

In assessing the lawfulness of a possible DoD policy of intracircuit acquiescence in *Witt*, we begin with a point made above: intracircuit acquiescence is the norm when an agency and a court of appeals construe an

applicable statute in different ways and the court of appeals has set forth its construction of the statute in a final, binding decision for which the mandate has issued. *See* Preston Testimony, *supra* note 5, at 44 (noting that "the general practice of federal agencies is to follow adverse court of appeals rulings"); *see also, e.g.*, 66 Fed. Reg. 6436, 6438 (Jan. 22, 2001) (final DOJ rule announcing nationwide acquiescence in court of appeals decisions holding that section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "is not to be applied in the cases of aliens whose deportation proceedings were commenced before AEDPA was enacted"); 55 Fed. Reg. 1012, 1016 (Jan. 11, 1990) (final Department of Health and Human Services ("HHS") rule establishing policy of applying within the relevant circuit those court of appeals decisions that HHS determines conflict with SSA policy, unless the government seeks further review of the decision). Furthermore, as far as we are aware, neither this Office nor any court has ever concluded that an agency's acquiescence in a court of appeals decision was unlawful. In fact, there is judicial precedent from the Ninth Circuit (and other circuits) directly addressing acquiescence and indicating that acquiescence may be compelled, *see Lopez*, 725 F.2d at 1489, or at least permissible, *cf. Castillo-Felix*, 601 F.2d at 467 (acquiescence not compelled).

Thus, the Executive Branch evidently has long viewed intracircuit acquiescence, although not legally required, as nonetheless an exercise of, and in accord with, the Executive's obligation to take care that the laws be faithfully executed. *See* U.S. Const. art. II, § 3. And the Executive has held this view even though acquiescence may involve an agency's accepting, and operating in conformity with, a construction of a statute that represents the controlling law of the circuit at the time, but that the Executive believes is incorrect and not legally binding on it as a party and that it intends at some opportune point to challenge in future litigation. The range of interests that are served by acquiescence have, in other words, been understood to make an agency's acceptance of even a disputed legal construction by a court of appeals a means of faithfully executing the statute in question, notwithstanding that the agency believes acquiescence will result in the agency's taking action at odds with its own view of the statute's proper implementation.

Given this long-established practice, we believe there would be little question of the permissibility of acquiescence if the conflict precipitated

by the *Witt* decision were due to the Ninth Circuit's differing construction of the statute. For example, acquiescence would be permissible if the court had concluded as a matter of statutory construction that separation is not warranted when based solely upon a finding of "homosexual conduct," and may instead be ordered only if there has been a more individualized determination about the need for the separation. In such a case, even if the agency construed the statute in a manner contrary to that adopted by the court, we think the agency could acquiesce in the circuit court's determination regarding what the statute prescribes.

But *Witt* is a constitutional, not a statutory, ruling. And the underlying statute on its face mandates DoD to take certain action in some instances. Accordingly, acquiescence in that decision by rendering separation contingent upon an individualized determination that the *Witt* court's heightened substantive due process standard has been met could, in application, result in DoD's declining to effect separations that section 654, standing alone, clearly would require. The situation before us thus raises a more substantial question than does the typical case of acquiescence in a circuit court's adverse statutory ruling. After all, the Executive Branch has no general power to disregard enforcement of a statute, *see Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838), and we do not understand DoD to be asserting that it has independently determined that section 654 is unconstitutional in any applications, *cf. Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. at 200. Thus, the possibility of DoD acquiescence in *Witt* presents the question whether DoD may take action that conforms to the Ninth Circuit's construction of the Constitution but that would be impermissible under section 654 in the absence of the court's constitutional ruling. The issue is made more substantial, moreover, because the *Witt* court's heightened substantive due process standard was announced in an interlocutory ruling in a case that is pending on remand.

We have not identified a prior occasion in which an agency has announced a policy of intracircuit acquiescence in a circuit court's constitutional ruling while the case in which the court issued the ruling remains pending. Indeed, in one recent instance presenting the opportunity for such acquiescence, the INS appears to have declined to acquiesce in various court of appeals decisions holding that 8 U.S.C. § 1226(c) (2006), which requires the mandatory detention of aliens found subject to remov-

al, violates the requirements of constitutional due process as applied to lawful permanent resident aliens absent the holding of an individualized bond hearing. *See Patel v. Zemski*, 275 F.3d 299 (3d Cir. 2001); *Welch v. Ashcroft*, 293 F.3d 213 (4th Cir. 2002); *Hoang v. Comfort*, 282 F.3d 1247 (10th Cir. 2002); *Kim v. Ziglar*, 276 F.3d 523 (9th Cir. 2002), *rev'd sub nom. Demore v. Kim*, 538 U.S. 510 (2003). Until the Supreme Court concluded in 2003 that the statute was in fact constitutional, *see Demore*, 538 U.S. 510, immigration judges, in conformity with the court of appeals decisions cited above, granted aliens in such circumstances individualized hearings. But the INS appears to have appealed every decision by an immigration judge to release the alien on bond, thus triggering an automatic stay of the release orders under INS regulations. *See Almonte-Vargas v. Elwood*, No. 02-cv-2666, 2002 WL 1471555, at *3 n.5 (E.D. Pa. June 28, 2002). The U.S. District Court for the Eastern District of Pennsylvania criticized this practice of apparent nonacquiescence as having been "designed to administratively overrule [the appeals court decisions requiring hearings] pending Supreme Court review of the mandatory detention issue." *Id.*; *see also id.* at *4 ("'The Government has not acquiesced to the Third Circuit's decision in *Patel*.'" (quoting government's Notice of Appeal to the Board of Immigration Appeals ("BIA") of the Bond Decision of the Immigration Judge, alterations omitted)).

However, the general tenor of the relevant statements by DOJ suggests that acquiescence is a permissible course of action in general—seemingly regardless of whether the underlying decision by the court of appeals is constitutional or statutory. For example, we are aware of no prior statements by DOJ that qualify in a relevant manner its view of the permissibility of acquiescence as a practice. And we have identified at least two instances in which agencies charged with enforcement of a statute have acquiesced in adverse judicial judgments holding that the statutes were unconstitutional if applied in a manner that the statute seemed to require, although each instance is in some way distinguishable from the type of acquiescence you have asked us to consider. *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 5 (2008) (noting that government did not appeal district court decision holding that tax on coal was unconstitutional and that the Internal Revenue Service "acquiesced in the District Court's holding") (citing IRS Notice 2000-28, 2000-1 Cum. Bull.

1116, 1116–17); *Matter of Silva*, 16 I. & N. Dec. 26, 29–30 (1976) (observing that Solicitor General had declined to seek review in *Francis v. INS*, 532 F.2d 268 (2d Cir. 1976), and stating that "[i]n view of the ruling in *Francis*," the BIA would "withdraw from the contrary position" regarding the constitutionality of 8 U.S.C. § 1182(c) "expressed by th[e] Board in" prior decisions).

The example that is most relevant here is *Silva*. That precedent, unlike the present situation, did not involve agency acquiescence in an interlocutory order issued in a case that remained pending. Nonetheless, the example is instructive. In *Silva*, 16 I. & N. Dec. at 29–30, the BIA acquiesced in *Francis*, 532 F.2d 268, a constitutional ruling by the Second Circuit regarding the application of 8 U.S.C. § 1182(c) (1970, repealed 1996). That provision by its terms authorized the Attorney General to waive certain grounds for exclusion applicable to permanent resident aliens "who temporarily proceeded abroad voluntarily." 8 U.S.C. § 1182(c). The *Francis* court held that the equal protection component of the Due Process Clause of the Fifth Amendment required the Attorney General to exercise his waiver authority under the statute equally with respect to aliens who had departed the country and those who had never left. 532 F.2d at 273. The BIA acquiesced in this ruling in every circuit but the Ninth Circuit—thereby retreating in every circuit except the Ninth from its established position that the Attorney General could exercise his waiver authority under section 1182(c) only with respect to departing aliens. *See Silva*, 16 I. & N. Dec. at 29–30. In the Ninth Circuit, however, the BIA maintained its prior reading of the statute, thus conforming its conduct to that circuit's own binding precedent. *See Tapia-Acuna v. INS*, 640 F.2d 223, 224–25 (9th Cir. 1981) ("The BIA has voluntarily adopted the rule announced in *Francis . . .* except in cases arising in the Ninth Circuit.") (internal citations omitted); *Abebe v. Holder*, 577 F.3d 1113, 1116 (9th Cir. 2009) (denial of petition for en banc panel rehearing and petition for full court rehearing en banc) (Berzon, J., dissenting from denial of full court rehearing) (observing that the BIA in *Silva* acquiesced in *Francis* "in all circuits except [the Ninth Circuit], where contrary precedent was controlling").[11] Thus, the example of *Silva* appears to

---

[11] The BIA adhered in the Ninth Circuit to its prior position until 1981, when the Ninth Circuit adopted the Second Circuit's view that the Constitution required application of the

demonstrate that an agency has in the past exercised discretion to determine whether and in what manner to acquiesce in constitutional rulings by courts of appeals that would require the agency to enforce a statute in a manner the agency believed would be contrary to what Congress would have intended in the absence of the adverse ruling.

### B.

In light of this past practice, and notwithstanding that we have identified no example of prior acquiescence that is precisely on point, we believe that DoD could lawfully acquiesce in *Witt*. In our view, Congress has not unambiguously expressed the intent to foreclose DoD from suspending enforcement of section 654 for the narrow and limited purpose of acquiescing in an adverse court of appeals precedent such as *Witt*, and the Take Care Clause, U.S. Const. art. II, § 3, does not impose an independent obligation to refrain from such acquiescence in the absence of a clear statutory bar to doing so. This conclusion holds even though the new procedures might result in the retention of service members whose separations the statute otherwise would require.

To be sure, the phrasing of the statute—in particular the provision that a service member "*shall* be separated," 10 U.S.C. § 654(b) (emphasis added)—indicates that Congress did not mean to authorize DoD to categorically decline to enforce section 654. However, "shall" is not a term that invariably admits of no exceptions without regard to the circumstances. In *Town of Castle Rock v. Gonzales*, for example, the Supreme Court held that a state statute providing that "'[a] peace officer shall enforce a valid restraining order'" does not "truly [make] enforcement of restraining orders mandatory." 545 U.S. 748, 759–60 (2005) (quoting Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999)). In reaching this conclusion, the Court relied on the "well established tradition of police discretion [that] has long coexisted with apparently mandatory arrest statutes." *Id.* at 760. Here, likewise, in enacting section 654, Congress legislated against a well-established historical practice of agencies generally acquiescing in ad-

---

statute to both departing and nondeparting aliens. *See Tapia-Acuna*, 640 F.2d 223. In 2009, however, the Ninth Circuit returned to its pre-1981 position that waiver under section 1182(c) is available only with respect to aliens who have left the country. *See Abebe v. Mukasey*, 554 F.3d 1203, 1207 (9th Cir. 2009) (en banc) (per curiam).

verse circuit precedent. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97, 698–99 (1979) (observing that it is "always appropriate to assume that our elected representatives, like other citizens, know the law" and that an "evaluation of congressional action . . . must take into account its contemporary legal context"). Indeed, insofar as we are aware, Congress has never purported to statutorily bar an agency from acquiescing in adverse circuit precedent. To the contrary, the legislation that Congress has considered on the subject has been uniformly directed at limiting the circumstances in which agencies may nonacquiesce, and would have applied even if the affected agencies believed an underlying statute was best read to require a course of action other than that prescribed by the governing law of the circuit.[12] The committee report accompanying a 1998 House-passed bill that would have generally barred agencies from declining to follow controlling circuit precedent, for example, stated that "citizens who file claims or who otherwise are involved in proceedings with federal agencies have the right to expect that those agencies will obey the law as interpreted by the courts." H.R. Rep. No. 105-395, at 3; *see also* H.R. Rep. No. 98-1039, at 37 (stating that "many of the conferees have strong concerns about some of the ways in which [SSA's] policy [of nonacquiescence] has been applied"); H.R. Rep. No. 98-618, at 24 (stating that "[w]hile the issue of the constitutionality of the non-acquiescence policy may be in doubt, the undesirable consequences of escalating hostility between the Federal courts and [HHS] are clear").

In light of this history, it is fair to expect that Congress would have spoken in clear and direct terms had it intended to prohibit DoD from engaging in this generally well-established agency practice of acquiescing in adverse circuit precedent. *Cf. INS v. St. Cyr*, 533 U.S. 289, 299 n.10 (2001) ("'In traditionally sensitive areas, the requirement of [a] clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (internal alterations omitted))). And we do not think that section 654's use of the word

---

[12] *See, e.g.*, H.R. 1544, 105th Cong. § 2(a) (as passed by House, Feb. 25, 1998) (bill that would require agencies to follow circuit precedent except in narrow specified circumstances); H.R. 3755, 98th Cong. § 302(b) (as passed by House, Mar. 27, 1984) (bill that would require acquiescence by Secretary of HHS in court of appeals decisions interpreting Social Security Act, except during pendency of Supreme Court review).

"shall," when read against this background, suffices to provide the clarity that would be necessary to conclude that Congress intended to displace the discretion to acquiesce that agencies generally retain and exercise. Nor do we think that, although Congress may fairly be understood not to have intended to bar DoD's intracircuit acquiescence in court of appeals rulings construing section 654, Congress must have intended to prohibit DoD from engaging in such acquiescence in court of appeals rulings imposing constitutional limits on the enforcement of section 654. There is no basis for concluding that Congress meant in section 654 to bar acquiescence in the latter, but not the former, contexts.

This conclusion draws additional support from the fact that the historical practice of intracircuit acquiescence reflects substantial government interests in avoiding the adverse potential consequences of nonacquiescence—such as inter-branch conflict and the imposition of significant burdens on regulated parties—that are present regardless whether statutory or constitutional rulings are involved. Indeed, legislative reports have at times cited considerations such as these in expressing concern regarding an agency's decision not to acquiesce. *See* H.R. Rep. No. 105-395, at 7 ("equity and orderly governance require that agencies, like private citizens, should obey the law enunciated by courts of competent jurisdiction"); H.R. Rep. No. 98-618, at 24 (raising concerns about "the result of [SSA's] non-acquiescence policy for claimants, the courts, and SSA").

These governmental interests may have particular force depending on the circumstances. An agency may conclude that intracircuit acquiescence is appropriate to demonstrate respect for a court of appeals and its status within the federal judiciary and to avoid the interbranch conflict that might otherwise result. *Cf.* H.R. Rep. No. 98-618, at 25 (expressing "concern[] about the increasing number and intensity of confrontations between [the SSA] and the courts as SSA refuses to apply circuit court opinions").[13] An agency may also view acquiescence in adverse circuit precedent as the best way to serve those affected by the relevant statutory regime and to ensure effective program administration. *See Atchison,*

---

[13] Indeed, as noted above, commentators have argued that this general interest arguably has even greater force where, as here, the agency would be acquiescing in a constitutional ruling. *Cf.* Estreicher & Revesz, 98 Yale L.J. at 720 n.214 (nonacquiescence is "much more troubling" in a constitutional rather than in a statutory case).

*Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 447 (7th Cir. 1994) (Easterbrook, J., concurring) ("[A]n agency prudently may decide to acquiesce, to reduce uncertainty and the costs of both the legal process and compliance with multiple standards . . . ."), *aff'd sub nom. Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 516 U.S. 152 (1996); *see also, e.g.,* 55 Fed. Reg. at 1017 (characterizing SSA's policy of acquiescence as "an appropriate exercise of our responsibility to administer the vast and complex Social Security benefit programs in a manner that is least burdensome to Social Security claimants and preserves our ability to attempt to maintain national uniformity in program administration"); 66 Fed. Reg. at 6438 (describing policy of acquiescence in section 440(d) of AEDPA as motivated by "the interest of the uniform and expeditious administration of the immigration laws"). The government may also have litigation-related reasons for acquiescing, including an interest in avoiding resource-consuming challenges to the agency's actions within the circuit, *see Castillo-Felix*, 601 F.2d at 467 (noting that nonacquiescence "would only invite appeal and reversal"), and a desire to advance the most advantageous litigation strategy for ensuring vindication of the government's position over the long term. And, again, these interests could, as a general matter, be served through agency acquiescence in constitutional, as well as statutory, rulings. Thus, although we are not aware of the precise rationales that DoD would invoke were it to decide to acquiesce in *Witt*, we cannot say that acquiescence here would be impermissible as a matter of law in light of these reasons why, as a general matter, agencies may permissibly acquiesce. Whether acquiescence would be advisable as a matter of policy in these circumstances, of course, is a distinct question that this memorandum does not address.

To be sure, because the *Witt* decision is an interlocutory ruling from which the government did not seek immediate appeal, a decision not to acquiesce would be in accord with a well-recognized exception to the usual practice of acquiescence. As the Department has previously observed in discussing the importance of the government retaining the option of nonacquiescence, a determination not to appeal an interlocutory ruling is not a determination that the government must conform its conduct to that ruling. *See* Preston Testimony, *supra* note 5, at 45. But we do not think it follows from this recognized exception to the general practice of acquiescence that DoD would be acting unlawfully if it chose to acqui-

esce in *Witt*. Although DOJ has stated that nonacquiescence in interlocutory decisions "may be entirely appropriate," *id.*, it never has suggested that intracircuit acquiescence in such cases would be unlawful. Indeed, in light of the attendant consequences—and collateral litigation—that may result from nonacquiescence, we could not say the government would have no legitimate interest in having the flexibility, at least in certain appropriate contexts, to acquiesce in an interlocutory decision until such time as the case ripens and the ruling may properly be subject to appeal. Simply put, even though the *Witt* ruling is set forth in an unappealed interlocutory order, the controlling law of the circuit is established by that ruling until such time as it may be reconsidered by the circuit itself or overruled by the Supreme Court. Accordingly, in our view, the procedural posture of a binding interlocutory ruling does not so undermine the comity and policy factors identified above that such acquiescence, even if it were determined to be ill-advised, would constitute a violation of the Executive's "AEDPA" responsibilities.

Another consideration that may arguably weaken the case for acquiescence here is one to which we have already alluded. It arises from the possible tension between such acquiescence and Congress's unqualified finding that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability," 10 U.S.C. § 654(a)(15). DoD acquiescence in *Witt* might well result in the Department declining to effectuate the separation of an individual whose separation the statute, standing alone, would appear to require. However, so long as any such decision is premised solely on DoD's interest in conforming its conduct to the controlling law of the circuit—and not on a broader judgment not to comply with section 654 or an independent judgment that the provision is unconstitutional—such tension would be at least somewhat mitigated. Indeed, because *Witt* is binding as a matter of *stare decisis* within the Ninth Circuit, separations that could not satisfy the *Witt* standard presumably could not be effected within that circuit if challenged in court so long as *Witt* remains the governing law. And that would be the case wholly independent of DoD's decision to acquiesce. Thus, at least with respect to this category of cases, an appropriately tailored policy of acquiescence may be understood as designed to conform

agency conduct to the governing law, given that any policy of acquiescence would be temporary and contingent on further developments in *Witt*.

We recognize that this Office has previously set forth guidance with respect to when the President may, consistent with his "take care" responsibilities, decline to enforce enacted legislation for constitutional reasons. *See Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199. This guidance notes that the President should presume that enactments are constitutional and, thereby, "give great deference to the fact that Congress passed the statute and that Congress believed it was upholding its obligation to enact constitutional legislation." *Id.* at 200. We also acknowledge in that guidance the "special role" of the Supreme Court in resolving disputes about the constitutionality of enactments and the deference to be accorded the Court's likely decisions regarding particular provisions. *Id.* We did not consider, however, the legitimacy of intracircuit acquiescence, which is a practice distinct from, and more cabined than, an Executive Branch decision not to enforce a statutory provision at all based on an independent assessment that the law is unconstitutional. Accordingly, we do not believe that the principles set forth in the guidance control the decision of an agency to acquiesce in adverse circuit precedent, even when that precedent imposes constitutional limits on an agency's ability to act in accord with what a statute would otherwise require. Thus, in light of the established historical practice of intracircuit acquiescence as a general matter, and the substantial interests that it can serve, we cannot conclude that such acquiescence would violate the Executive's "take care" responsibilities here, even if it could result in some instances in nonenforcement of an otherwise mandatory statutory command.

Our conclusion is consistent with, although it is not compelled by, judicial precedents in other contexts involving agency decisions not to enforce a statute. As the Supreme Court has observed, "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities," and "[t]hat discretion is at its height when the agency decides not to bring an enforcement action." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). Indeed, in *Heckler v. Chaney*, the Court stated that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally

committed to an agency's absolute discretion," and attributed this proposition "to the general unsuitability for judicial review of agency decisions to refuse enforcement." 470 U.S. 821, 831 (1985).[14] In particular, the Court noted, "an agency decision not to enforce often involves a complicated balancing of a numbers of factors which are peculiarly within its expertise." *Id.* These factors include not only whether "a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* An agency decision, based on considerations of inter-branch comity and sound policy, to suspend enforcement of a statute within a particular circuit in order to acquiesce in a court of appeals decision resembles a decision not to enforce based on the types of "factors" identified in *Chaney* as "peculiarly within [an agency's] expertise." *Id.*

We acknowledge, however, that extending the reasoning of *Chaney* to a practice of intracircuit acquiescence such as the one proposed here would raise two potentially significant concerns. First, as the Eighth Circuit has noted, the *Chaney* framework for determining whether agency action rests within the agency's sole discretion appears to "appl[y] to individual, case-by-case determinations of when to enforce existing regulations rather than permanent policies or standards." *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *see also Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994) (noting that general enforcement policies are "more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are . . . particularly within the agency's expertise and discretion"). A formal policy of acquiescence in *Witt* resembles the more broadly applicable type

---

[14] The precise question at issue in *Chaney* was whether an agency's decision not to enforce a statute was subject to judicial review under the Administrative Procedure Act ("APA"). The Court observed that under 5 U.S.C. § 701(a)(2), an agency's action is not subject to judicial review if it is "'committed to agency discretion by law.'" *Chaney*, 470 U.S. at 828. Thus, although the question directly presented in *Chaney* was the availability of judicial review under the APA, the Court resolved that question by determining whether Congress had afforded the agency the requisite nonenforcement discretion.

of categorical nonenforcement policy that even the "absolute discretion" discussed in *Chaney* may not encompass. Second, as the Court also recognized in *Chaney*, "Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." 470 U.S. at 833. And, in discussing a prior decision, *Dunlop v. Bachowski*, 421 U.S. 560 (1975), the *Chaney* Court stated that the statute at issue in that case, which provided that the Secretary of Labor "'shall investigate [a] complaint and, if he finds probable cause to believe that a violation has occurred he shall bring a civil action,'" "quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." 470 U.S. at 833–34 (quoting 29 U.S.C. § 482(b), internal alterations omitted); *see also id.* at 833 (discussing the provision at issue in *Dunlop* as "an example of statutory language which supplied sufficient standards to rebut the presumption of unreviewability"); Letter for Richard W. Allen, Assistant General Counsel for General Law, Consumer Product Safety Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel 3 n.* (Dec. 14, 1977) (observing that an agency's "[e]nforcement discretion may be circumscribed to a substantial degree if the agency is guided by a statute that employs mandatory enforcement language").

Nonetheless, the potential nonenforcement decision here—assuming it is based upon temporary acquiescence in a court of appeals decision within that court's jurisdiction—would be of the type that is "often inherently policy driven and thus best left to the discretion of the agency" rather than to the reviewing court. *Harrington v. Chao*, 372 F.3d 52, 55 (1st Cir. 2004). Accordingly, and in light of an established general practice of acquiescence, it is fair to assume that Congress did not mean to bar such a course of action, at least absent a clearer statement to that effect than is evidenced in section 654, notwithstanding its use of the mandatory term "shall." Indeed, as the Court explained in *Dunlop*, even if a governing statute establishes that a nonenforcement decision is not "an unreviewable exercise of prosecutorial discretion," such decisions should still be reviewed under an extremely deferential standard, asking only whether the decision was "so irrational as to constitute the decision arbitrary and capricious." 421 U.S. at 567 n.7, 573; *see also Harrington*, 372 F.3d at 55–56 (Secretary's decision to enforce 29 U.S.C. § 482 "is reviewed only

under the highly limited arbitrary and capricious standard contained in the Administrative Procedure Act, 5 U.S.C. § 706," and "a court reviews the Secretary's stated reasons for not suing only to determine whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") (citations and internal quotation marks omitted). Thus, although an agency may not "consciously and expressly adopt a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, we could not say that a DoD policy of suspending the enforcement of section 654 in a limited class of cases in order to acquiesce in the *Witt* decision would constitute action of that kind.

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*